BEATTY, Justice.
This is an appeal from a judgment based upon a jury verdict in favor of the proponent in a will contest. We affirm.
The contestants contend that the trial court erred in refusing a certain jury instruction and in allowing certain testimony on the issue of mental competency, and they contend that the verdict was against the great weight of the evidence.
The testator, James Alexander Lawrence, was born in Hale County on November 5, 1899. He executed the will in question on May 16, 1980, and died on January 16, 1985.
Mr. Lawrence had attended the University of Alabama in 1918 and while a student there was a member of the Student Army Training Corps. Prior to his discharge from that corps, he was treated for illness at the University Infirmary.
In 1921, Mr. Lawrence began a series of claims with the predecessor to the United States Veterans’ Administration, asserting a service connected physical disability. In 1923, he was awarded a 20% temporary partial disability for chronic orchitis, and later that year he was diagnosed as suffering from neurasthenia. Later, in March 1925, based upon another examination at the Veterans Hospital at Gulfport, Mississippi, his condition was diagnosed as dementia praecox, hebephrenic type, and he was rated as totally disabled. His father was appointed as his guardian, and Mr. Lawrence was hospitalized in the Gulfport hospital. Curiously enough, Mr. Lawrence appears to have been free to move about outside the hospital. He purchased several parcels of real estate and built a house on one of them. The auditor of the hospital later purchased the lot with the house, and an attending physician purchased the other lots.
In 1926, Mr. Lawrence was released from the hospital in the custody of his father. Because his father was illiterate, Mr. Lawrence himself maintained the records of his guardianship and filed regular reports to the Veterans Bureau. Apparently, Mr. Lawrence returned to Greensboro and, except for a time in 1968, remained there until sometime in 1979, when he was admitted to the Veterans’ Administration Medical Center in Tuscaloosa. While in Greensboro during the 1930’s, he peddled sundries on the streets, and some persons referred to him as “Crack,” meaning “crackpot.” His father died during the 1940’s, and he was appointed a new guardian, E.P. Martin, with whom he had little or no contact.
In September 1970, Mr. Lawrence was evaluated by a treatment team at the Veterans’ Administration Medical Center in Tuscaloosa, among them being Dr. James F. Folsom, the director. This team concluded that Mr. Lawrence was “competent to handle his own affairs and finances.” That team wrote: “We certainly recommend that his competency rating be reevaluated and that he be declared competent for Veterans Administration purposes. We think that the guardianship should be removed.”
Sometime in 1973, Mr. Lawrence contacted a Tuscaloosa lawyer, James A. Turner, for the purpose of making a will. Mr. Turner advised that Mr. Lawrence needed to have the guardianship removed and to have the management of his estate restored to him. Thereafter, on October 17, 1973, the probate court,of Hale County approved a final settlement of the guardianship and discharged the guardian. In March 1974, Mr. Turner drafted a will for Mr. Lawrence.
In 1976, Mr. Lawrence petitioned for and received letters of administration on the estate of his late mother, which consisted of land and approximately $4,000 in funds. The probate judge of Hale County made a determination that Mr. Lawrence was competent, although he conceded that no one *632 opposed the petition. Thereafter, on August 19, 1977, that same probate court granted Mr. Lawrence’s petition for final settlement and discharge as administrator.
Sometime in October 1979, while Mr. Lawrence was a patient at the Veterans’ Administration Medical Center in Tuscaloosa, having been readmitted from a community placement house after suffering a light stroke and deteriorating physically and mentally, he was treated in the psychiatric unit. The following comments appear in a report of his condition prepared by a staff physician at that time:
“Shortly after admission patient appeared depressed and attempted suicide by placing a rope around his neck. He was transferred to an acute psychiatric unit for close observation. Patient received treatment on medical unit for marked physical and mental deterioration. He’s shown increased weakness. Requires assistance in dressing. Has definite trouble with motor skills; has been incognizant at night. On occasion is more confused. Appears to be detached and attending his own thoughts rather than socializing with others. He realizes his limitations. Gives the impression of having given up. He has a great deal of money and property that he worries about and becomes somewhat paranoid because he is no longer able to take care of his business affairs. He is presently considered competent for VA purposes; but the treatment team recommends that a guardian be appointed as soon as possible to take care of the patient’s finances. They feel that this would be therapeutic for the patient not to have to wor^y about his property or money at this time. Diagnosis, schizophrenia paranoid type, hypertension, enu-cleation of right eye, transient ischemic attack by history 2/79; signed by G.G. Ochoa, M.D., staff physician.”
Indeed, the record discloses that Mr. Lawrence had amassed a sizable estate in bonds and cash on deposit at various banks.
Despite the recommendations contained in that report, the Veterans’ Administration determined that a lack of due process had occurred in the rating process. Accordingly, no guardian was appointed, and the conclusions on competency were voided. In fact, his treatment team, on September 10, 1980, noted that Mr. Lawrence was “competent for Veterans Administration purposes,” and was “mentally competent to manage [his] own affairs including finances.”
It is unclear from the record just where Mr. Lawrence resided between the time of that finding of competency and the date of his death, January 16, 1985. It is shown that he made a new will on May 16, 1980, as a resident of Tuscaloosa. This will left his entire estate, after the payment of debts, etc., to Judson College, a bequest he had been considering at least since March 1979. There is also evidence that he was residing for a time at a private retirement home in Northport. At the time of his death, he was a resident of Hale County.
The First National Bank of Tuskaloosa was nominated in the May 1980 will as executor, and, in due course, it petitioned for admission of that will to probate and for letters testamentary. After notice to all known heirs and next of kin, and after a guardian ad litem was appointed for those unknown, the probate court held a hearing. That court found that the will was duly and legally executed, and it granted the petition. The plaintiffs, Jerry B. Lawrence, Mildred Johnson Warren, Ivey Johnson Mayhew, and Sam Johnson, Jr., filed this contest, contending that the testator lacked the testamentary capacity to execute the will, or that it was executed under undue influence. The contest was then removed to the Hale Circuit Court. The defendant-proponent, First National Bank of Tuska-loosa, filed its answer denying the allegations.
The contest proceeded to trial before a jury, which found for the proponent, and this appeal followed.
I.
Did the trial court err in failing to instruct the jury that proponent's Exhibits *633 1A through IE were admitted into evidence for a limited purpose?
This issue arose while the proponent was questioning the probate judge of Hale County on direct examination. The proponent offered as exhibits the Veterans ‘Administration certificate of competency of August 31, 1973 (Exhibit 1A); the petition of E.P. Martin, dated September 14, 1973, for a declaration that James A. Lawrence was competent and for Martin’s discharge as guardian (Exhibit IB); the order of the probate court of Hale County revoking Martin’s guardianship and declaring Mr. Lawrence competent (Exhibit 1C); Mr. Martin’s final settlement as guardian (Exhibit ID); and the final decree of the probate court of Hale County discharging the guardian, E.P. Martin (Exhibit IE). Counsel for the contestants objected to the admission of these documents “if they are being admitted to show a final determination by the probate judge as a judgment of competency.” He added:
“There is nothing more than a Veterans Administration procedure; and the code section which they cite which is Title 21, Section 176 ... is not a legal determination of competency or incompetency. We would object to them on that basis. But we don’t have any objection to them being entered for being whatever they are.”
(Emphasis added.)[1] Thereupon the trial court overruled the objection and admitted the documents into evidence “for the limited purpose of showing those are the records of the probate office.” The proponent then conceded that “[t]hat’s how we offer them.”
Following the examination of this witness, the contestants moved to either have those exhibits removed from the evidence or to have the jury instructed in regard to their effect. After a discussion between counsel and the trial court, the court stated that the jury would be instructed that these exhibits “were admitted not in proof of an adjudication of the man’s condition, but only for the purpose of illustrating that there was a proceeding and for whatever purpose that may be shown on the instruments themselves.”
At a later stage of the proceedings, the proponent moved for, and the trial court granted, a motion for a directed verdict on contestants’ allegation of undue influence. The contestants then moved for a directed verdict on the allegation of mental incompetency at the time the will was made. We quote the pertinent portions of the dialogue that occurred:
“[CONTESTANTS' COUNSEL]: ... But I would like to make a motion for a directed verdict. I would like to make it two-fold. First, to the evidence as a whole; in that there is not any evidence that — well, let me put it — res judicata in that there was a finding of non compos mentis according to the testimony of the Judge of Probate. If you recall, I showed him the record of a partial settlement of the estate of James A. Lawrence and he was referred to in the documents signed by the probate judge, not this probate judge, but a prior probate judge, as a non compos mentis. The removal of guardianship which is in evidence before the Court is void on its face as to a non compos mentis finding. And we would first submit the motion for directed verdict based on the fact that that is res judicata.
[[Image here]]
“THE COURT: Well, of course y’all have really caused me to be somewhat in a quandary insofar as these prior adjudi *634 cations are concerned. Because first off, they came in without objection; or they came in with limited objections. And then the questions and the line that the questions took clearly extended the evidence without objection into an area that would otherwise I think would have been objectionable. Those things — and as I understand it aren’t really admissible for the purposes that you all are discussing now because all of those things are irrelevant; and the only thing that’s relevant is what this jury believes here today. So I’ll overrule the motion on that.”
At the conclusion of the evidence, counsel and the trial court held a charge conference. Contestants’ counsel announced that he was not withdrawing his earlier motion based on res judicata, and then the following occurred:
“[CONTESTANTS’ COUNSEL]: One question that I’ve got; are you going to say anything to the jury in the way of a charge in regard to the binding or lack of binding effect of the VA finding of competence or incompetence?
“THE COURT: I hadn’t intended to.
“[CONTESTANTS’ COUNSEL]: I don’t have anything written on that.
“THE COURT: I think if you want to make comment on that, it could be in your argument. I am going to tell them when I tell them what the issues are, there is only one issue and it is plain and simple, did this man have the sufficient mental capacity to execute a will on the date in question, May 16th, 1980. And that’s the only issue; did he or did he not.
“[CONTESTANTS’ COUNSEL]: Have the mental capacity to make a will on that date; fine, then, Judge.”
As we understand contestants’ argument on appeal, they contend that the original finding of the Hale County probate court establishing a guardianship for Mr. Lawrence, who was referred to in that proceeding as a non compos mentis, was res judi-cata on that issue, meaning that a subsequent opposite finding by that same court, as exemplified by proponent’s exhibits 1A through IE, was of no effect. We find ourselves in a quandary similar to that of the trial court in considering this argument. For one thing, if the earlier finding of the probate court were res judicata on the issue of a ward’s incompetency, then, as a matter of law, any subsequent evidence of a restoration of competency would be inadmissible. Not only would such a position be inconsistent with medical science, but it would eliminate consideration of such issues from the jurisdiction of the circuit court upon removal from the probate court.
Moreover, the contestant acceded to the admission of the exhibits in question “for being whatever they are.” What are they? Obviously, they are documents whose contents disclose a subsequent guardianship proceeding in the probate court of Hale County in which the court found the ward competent and discharged the guardian. While such a procedure may be, as contestants’ counsel argues, a “Veterans Administration procedure,” nevertheless, the Alabama statute authorizing that procedure expressly mandates that:
“[W]hen any incompetent ward has been rated competent by the administration, a certificate of the administrator or his duly authorized representative to that effect shall be prima facie evidence [in a court of competent jurisdiction] that a guardian is no longer required and the court, upon the guardian filing a satisfactory final account, may discharge such guardian upon a petition filed for that purpose.”
(Emphasis added.) Section 26-9-16, Code 1975. That statute goes on to state that “[n]othing contained in this section shall be construed to prevent a ward from filing a petition for the discharge of his guardian on the ground that the ward has attained majority or is competent or the court from acting on its own motion in such cases.” It follows that the earlier probate proceeding, which appointed E.P. Martin as guardian of the testator, was not res judicata on the issue of the testator's competency any more than the subsequent decision of the probate court removing the guardianship was itself res judicata. Indeed, that deci *635 sion, apparently based upon the Veterans’ Administration rating of competency, was, under the statute, prima facie evidence that a guardian was “no longer required ” because of a restoration of competency. (Emphasis added.) It follows, therefore, that when the contestants’ counsel agreed to the admission of the pertinent exhibits “for whatever they are,” he agreed to that prima facie quality, and cannot now complain of any error in the trial court’s failure to grant his directed verdict motion.
In addition, the record discloses that the contestants’ counsel cross-examined the probate judge concerning the meaning and effect of Exhibits 1A through IE, their relation to Veterans’ Administration purposes, and the legal requirements for the termination of a guardianship. Thus, the contestants’ counsel went beyond the mere fact of the existence of these documents, and he himself introduced evidence touching upon their merits. Hence, any objection he had made with respect to their admissibility was waived. Lockhart v. Robbins, 386 So.2d 424 (Ala.1980).
Finally, it is clear from the record and from contestants’ brief that contestants did not request any jury instruction on the subject of either the Veterans’ Administration finding of competency, or the Hale County probate court’s finding of competency, or the statutes applicable thereto. Indeed, the record shows that after the trial court asked whether the parties had any exceptions to the oral charge it had given, the contestants responded: “None, your Honor.” Thus, under Rule 51, A.R. Civ.P., no error can be predicated on the trial court’s failure or refusal to instruct on the subject we have discussed. Moon v. Nolen, 294 Ala. 454, 318 So.2d 690 (1975).
II.
Did the trial court err in allowing a certain witness to give his opinion on the mental competency of the testator?
The witness, Leonard K. Blalock, was employed as a program supervisor in social work service for the Veterans’ Administration Medical Center in Tuscaloosa, where he had been employed for 21 years. In that capacity, he supervised five master’s-degree social workers in the outpatient programs involving contract nursing homes, community residential care, and field social work. He had earned a bachelor of arts degree in liberal arts and a master’s degree in psychiatric social work and had completed a number of in-service training periods in mental health, including the study of appropriate treatment and other aspects of mental illness, at several mental health facilities. Mr. Blalock had completed a course on the management of the treatment team concept in use at mental illness centers and other courses in the treatment of the mentally ill and those with behavioral problems. He had served for a number of years as a member of a psychiatric treatment team and as a leader of a team that dealt with the diagnosis and treatment of psychiatric patients. He had held adjunct faculty positions at Jefferson State Junior College and the University of Alabama, supervising social work trainees at the Veterans’ Administration Medical Center in Tuscaloosa.
Mr. Blalock testified of his 17 years’ acquaintance with Mr. Lawrence:
“A. ... He was initially referred to me, and I believe in December 1967, following a period of hospitalization on the medical unit at the VA Medical Center in Tuscaloosa. He was referred to me for assistance in finding a place to live, placement, so to speak; and follow up of the veteran in the community following his hospitalization there. He was released to a trial-visit status and I followed him throughout that trial-visit status. Following that, he was released from the VA Medical Center and I maintained contact with him over a period of time. I guess until he died; on a fairly frequent basis, although I did not always have specific case responsibility throughout that entire time. He would contact me as a friend, as a consultant, as an advisor; someone he could come to when he had a problem that he needed assistance with.
“Q. Would it be fair to say that you had frequent contact with Mr. Lawrence *636 from the time you met him in 1967 until the time of his death?
“A. Yes. Now, that would be periodic; because he would usually initiate the contact. And he would come to see me when he needed to. When I was following him as a case worker at that time, I saw him on at least a monthly basis; and usually more often. But following that, I would see him as the need was there or as he needed to see me; which was a fairly frequent basis.”
Mr. Blalock testified extensively concerning Mr. Lawrence’s treatment over the years at the Tuscaloosa facility and detailed the events leading to the diagnoses concerning him. For example, he explained one of the findings:
“Q. Let me stop you there. What is schizoid personality disorder?
“A. It’s a psychiatric diagnosis that a — a personality disorder indicates that a person has a condition that is not psychotic. Indicating that—
“Q. Go ahead. Explain that.
“A. Well, in layman's terms, it indicates that a person is not regarded as crazy. Simply that he has a condition that is noteworthy, but it’s not a condition that would classify him as psychotic.”
And he was asked the following questions without objection:
“Q. Let me ask you this. Was — in your opinion, was James Alexander Lawrence mentally competent, mentally sound?
“A. Absolutely, yes.
“Q. And would that be for VA purposes or for any other purposes?
“A. In my opinion for any purpose.”
We need not decide whether Mr. Blalock was qualified as an expert, for under Alabama law even a lay witness may testify in a will contest that another person was “of sound mind” or “mentally sound” or “mentally competent,” without transgressing the rule prohibiting testimony on the ultimate fact, Elliott v. Elliott, 372 So.2d 846 (Ala.1979); C. Gamble, McElroy’s Alabama Evidence, § 128.01 (3d ed. 1977), provided the proper predicate has been laid. As stated in Ex parte Lee, 506 So.2d 301, 303 (Ala.1987):
“To lay a proper predicate for the admission of such an opinion, a witness must first have testified: (1) to facts showing that he had an adequate opportunity to observe such defendant’s conduct in general, and (2) to his personal observation of specific irrational conduct of the defendant.”
(Emphasis added.) The record discloses more than adequate facts supporting the basis for Mr. Blalock’s opinion, and so, even assuming a proper objection, the trial judge committed no error in admitting this testimony.
III.
Was the jury’s finding against the great weight of the evidence?
It is sufficient to state that the testimony on Mr. Lawrence’s mental condition was divided. On the contestants’ side, there was evidence tending to establish incompetency at the time the will was executed. On the proponent’s side, several witnesses detailed facts and gave opinions that tended to establish competency at that time. Among these were the probate judge of Hale County, the lawyer who drew the will, a banker who had transacted business with him and assisted him in financial affairs, a practicing lawyer in Greensboro, and the psychiatric social worker, Mr. Blalock. Accordingly, the jury’s verdict was not contrary to the great weight of the evidence.
Let the judgment be affirmed.
AFFIRMED.
MADDOX, ALMON, ADAMS and HOUSTON, JJ., concur.

. Formerly Tit. 21, § 176, Code of 1940 (Re-comp. 1958), now Code of 1975, § 26-9-16:
"When a minor ward for whom a guardian has been appointed shall have attained his majority and has not been found incompetent and when any incompetent ward has been rated competent by the administration, a certificate of the administrator or his duly authorized representative to that effect shall be pri-ma facie evidence that a guardian is no longer required and the court, upon the guardian filing a satisfactory final account, may discharge such guardian upon a petition filed for that purpose. Nothing contained in this section shall be construed to prevent a ward from filing a petition for the discharge of his guardian on the ground that the ward has attained majority or is competent or the court from acting on its own motion in such cases.”