The petitioner, John Michael Lee, was indicted in October 1984 by the Grand Jury of Covington County on the charge of robbery in the first degree. See § 13A-8-41, Code of 1975. After a jury trial, Lee was found not guilty by reason of insanity. Subsequently, a hearing was held to determine whether Lee should be involuntarily committed to the Alabama Department of Mental Health. After this hearing, the trial court issued an order which, in pertinent part, read as follows:
 "Upon hearing the evidence, the Court finds that the Defendant [Lee] is mentally ill and as a consequence of such mental illness poses a real and present threat of substantial harm to himself and to others; it is therefore, ORDERED, ADJUDGED, and DECREED that the Defendant *Page 302 
shall be committed to the custody of the Alabama Department of Mental Health to be confined by said department until he is restored to his right mind or no longer poses a real and present threat of substantial harm to himself or to others."
After his post-trial motions were denied, Lee appealed from that judgment to the Alabama Court of Criminal Appeals. That court affirmed the trial court's judgment without issuing an opinion, 486 So.2d 523 (Ala.Cr.App. 1986). Counsel for Lee applied for rehearing and duly included as part of the application a request for a statement of additional facts pursuant to Rule 39(k), A.R.A.P. Rehearing and the Rule 39(k) request were denied. We granted certiorari to review the correctness of the decision of the Court of Criminal Appeals. We reverse and remand.
The underlying facts of this case are rather curious. The victim, Boggie Pickron, testified as follows: Lee and two other individuals, Jimmy Drinkwater (Lee's half-brother) and Fred Suttles, drove up to Pickron's trailer home in Florala, Alabama, on the night of March 10, 1984. Pickron, who had been drinking wine, invited the three into his home even though he did not know them. Once inside, the three began to smoke marijuana while Pickron continued to drink wine. Then, one of the trio, a "tall red-headed boy" (Suttles), asked Pickron if he wanted to gamble. After first refusing, Pickron decided to "cut high card" with Suttles for two dollars. Having decided to gamble, Pickron took a sum of money out of his pocket. Before they could cut the cards, however, Suttles pulled out a pistol and pointed it at Pickron. Suttles then took the money and, along with Lee and Drinkwater, left the trailer and drove away. The amount of money taken totaled $160.
Jimmy Drinkwater testified similarly. He admitted that he, Lee, and Suttles had been to Pickron's trailer on March 10, 1984. He also admitted that he had participated in the robbery of Pickron. However, he stated his belief that Lee had not participated in the crime. He said that he did not remember seeing Lee take any money from Pickron, and that although he did not see who it was that actually took the money, and even though the pistol Suttles used belonged to Lee, he believed that only he and Suttles had actually participated in the robbery.
Curiously, Lee's recollection of the extent to which he participated in the robbery differed from the account set out above. In a statement which was read into evidence, and which had been written by Lee's own hand, Lee related the following:
 "On March 10, 1984, my brother Jimmy and myself, picked up Freddie Suttles in front of place of residence at the time of 8:50. From that point Freddie wanted to cruise around to see what's going on — then had an idea of wanting someone to go to Paxton's Tom Thumb to pick up beer — that was roughly 9:00. At about 9:15 we went riding through Florala for about an hour before we went to the victim's house. We passed the house as if to go out of town. That's when the victim offered us to come in for a visit. At first he, the victim, wanted to go to the Hill Top Bar and thus Freddie agreed to do for a fifth of Night Train wine which was about five to ten. Then we sat down and he, the victim, offer us a drink. Freddie obliged and lit a joint of pot and it was passed between the four us, victim included. This scene went on for awhile. Before long Freddie was playing head games with the man to see how much the man could tolerate. Then Freddie asked if he could play cards after seeing the man's money. Freddie borrowed eleven dollars from me to pay against the man and this ended shortly afterwards when Freddie was accused of cheating by the winning of two dollars. At that time Jimmy and myself were in and out of the house. When Freddie got excited to get the money and go, he asked for my health card at what time I did not know what he wanted it for but until later when he tried to pose as a cop. That's when he took the gun he got earlier from the backseat of my car, the gun was also mine, and pointed it at the man and said that he was under arrest *Page 303 
and was going to jail. At this time I stepped out for a minute. For awhile I was out of reach to see or hear anything for about ten minutes. When I came to ear shot of what was going on Jimmy was at the driver's side of the car — I walked toward the front of the house to hear Freddie tell the man to strip for a body search which did not happen. About three minutes later I did not see or hear Freddie anywhere. All of a sudden someone said get the money off the table and not knowing why — I did. Shortly afterwards the man ran out of the house. I got in the car first, Jimmy second, Freddie driving, when we left — we went through town driving and got out on the Crestview Highway. Freddie started to drive reckless and Jimmy and I told Freddie to stop and get in the back seat because he nearly caused us to have a accident on the highway. After he stop and pulled over he got in the back and I got behind the wheel of the car after checking the tires for damage. Before turning back to town, I turned on the inside light to see how much money I grabbed and to check if it was mine. Then Freddie says let me see the money, so I gave it to him without knowing anything about it. Then I drove Freddie home but before he got out he threw up all over my car. After we drop him off I parked the car and Jimmy and myself went walking around and went home. Before I dropped Freddie off I told him to keep the money but just give me back my eleven dollars."
During cross-examination of the police officer who had read Lee's statement into evidence, Lee's counsel attempted to elicit the officer's opinion as to Lee's mental state at the time he gave the statement. The trial court sustained an objection by the State and refused to allow the testimony. Lee's counsel argues that this ruling unnecessarily limited his right to cross-examination and constitutes reversible error. We agree.
In Alabama, a lay witness may give his opinion on the question of a defendant's sanity or insanity as long as the proper predicate has been laid. Williams v. State, 291 Ala. 213, 279 So.2d 478 (1973); Lokos v. State, 434 So.2d 818
(Ala.Crim.App. 1982), affirmed, 434 So.2d 831 (Ala. 1983); Carrollv. State, 370 So.2d 749 (Ala.Crim.App.), cert. denied,370 So.2d 761 (Ala. 1979). To lay a proper predicate for the admission of such an opinion, a witness must first have testified: (1) to facts showing that he had an adequate opportunity to observe such defendant's conduct in general, and (2) to his personal observation of specific irrational conduct of the defendant. See Williams v. State, supra; Lokos v. State,supra; Carroll v. State, supra. See also C. Gamble, McElroy'sAlabama Evidence, § 128.02 (3d ed. 1977). Of course, in making the determination as to whether the witness has had an adequate opportunity to observe such defendant's conduct so as to render his opinion admissible, much is left to the sound legal discretion of the trial court. Williams v. State, supra.
In the present case, the following transpired during the cross-examination in issue:
 "Q. Officer Hutcheson, how long have you known John Michael Lee?
"A. I suppose better than a year.
 "Q. All right, have you seen him off and on down there in Florala?
"A. Yes, sir, I have.
 "Q. On how many occasions would you think that you had seen him down there?
"A. Several, several occasions.
"Q. Including the month of March, 1984?
"A. Probably so.
 "Q. Which is the month when the transaction at Boggie Pickron's took place.
"A. Yes, sir.
 "Q. And on the occasions that you saw him, had you ever noticed him doing anything particularly peculiar one way or the other?
". . . .
"A. Yes, I have. *Page 304 
 "Q. Would you kind of give us an example or two if you wouldn't mind?
 "A. One thing, walking the streets, you know, early in the mornings from I suppose his mother's house to home somewhere in Paxton. Or his grandmother's house in Paxton, well on the other side of Paxton which is several miles. In and out of the post office checking wanted posters, you know, speaking of mafia all the time.
"Q. How far was he walking, do you know?
"A. I suppose a good fifteen miles.
"Q. What time of day would this be?
 "A. This would be anywhere from three in the morning til five.
"Q. Three a.m. to five a.m.?
"A. Yes, sir.
 "Q. You mentioned that he had talked to you about the mafia?
"A. Yes, sir.
 "Q. Did John seem to think that he had some connection with the mafia?
"A. He seemed to himself, he did.
 "Q. All right, did he ever show you any letters he had written?
"A. Yes, sir.
 "Q. How many letters would you say he had written?
"A. Well he had a notebook full of them.
". . . .
"Q. Was there anything unusual in those letters?
"A. Sure.
 "Q. Were there things like did he think that somebody owed him forty million dollars?
"MR. LOGGINS: Object, Your Honor.
"Q. Was that in any of the letters?
"THE COURT: I sustain the objection.
 "Q. Did you ever notice anything in the letters that you thought were out of the way for a person of a sound mind?
"MR. LOGGINS: Object.
 "Q. Something a person with a sound mind would not have written?
"MR. LOGGINS: We object.
"THE COURT: I sustain in that form.
". . . .
 "Q. Did Johnny Michael Lee in any of these letters ever exhibit anything unusual of that nature that would lead you to have those kind of thoughts about him?
"MR. LOGGINS: We object again, Your Honor.
 "THE COURT: I am going to sustain the objection to that, Mr. McKathan. I think I outlined to you what it is a layman has to testify and I sustain the objection.
 "Q. Along about the time there during March, or say in the preceding weeks and months there, when you saw these letters, was there something in the letters themselves that you noted to be of a peculiar nature that a person with normal competency, you didn't feel like would write that kind of letter?
". . . .
"A. Yes, sir.
"Q. What was it?
 "A. The mafia was supposed to drop, you know, anywhere in the amount of a hundred million dollars off at his residence.
 "Q. And there were a lot of these letters, weren't there?
"A. Yes, sir.
"Q. He brought them down for you to see?
"A. Yes, sir.
 "Q. And he admitted these letters to you, didn't he, these are my letters?
"A. Yes, sir.
 "Q. In your opinion, Officer Hutcheson, does the defendant have mental problems?
"MR. LOGGINS: We object, Your Honor, to that.
"THE COURT: I sustain that.
"Q. In your opinion, is he normal?
"MR. LOGGINS: We object to that, Your Honor.
"THE COURT: I sustain that."
 Later, during redirect examination of this witness, the trial judge explained:
 "THE COURT: You can't do that. A layman can testify as to specific instances. *Page 305 
He can't have an opinion, he is not qualified, that is for the jury. If you have got any specific instance though, that would be rebuttal."
The testimony set out above clearly shows that Lee's counsel had laid a proper predicate for the admission of the officer's opinion as to whether Lee was insane. Failure to allow this opinion to be given constituted an abuse of discretion and reversible error. Hunter v. State, 335 So.2d 194
(Ala.Crim.App.), cert. denied, 335 So.2d 203 (Ala. 1976). See Williams,supra; Lokos, supra; Carroll, supra. The prejudice to the defendant in this case is obvious even though the jury returned a verdict of not guilty by reason of insanity. Lee's state of mind at the time he gave the confession would have a direct bearing upon the jury's consideration of the trustworthiness of the statement. If the jury had believed that Lee was insane at the time he gave the statement, it could have rejected his statement as untrustworthy and accepted that version of the facts regarding Lee's participation in the crime which was offered by everyone except Lee, i.e., that he did not participate in the crime. Once the jury had found that Lee had not participated in the crime, it could not have returned a verdict of not guilty by reason of insanity. A person must necessarily have committed a criminal act in order to be found not guilty by reason of insanity. Jones v. United States,463 U.S. 354, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983).
The failure of the trial court to allow the officer to give his opinion as to Lee's insanity at the time Lee made his statement constitutes reversible error. Accordingly, the judgment of the Court of Criminal Appeals is reversed, and this cause is remanded to that court with directions to order a new trial.
REVERSED AND REMANDED.
All the Justices concur.