Philomena Delores Ellis was convicted of murder in violation of Ala. Code 1975, § 13A-6-2, and was sentenced to 35 years' imprisonment. Ellis raises five issues on this appeal from that conviction. *Page 746 
The undisputed evidence shows that on the morning of October 21, 1987, the 31-year-old defendant killed her 14-month-old daughter by stabbing the infant in the back eight times with a kitchen knife, and then attempted to take her own life by stabbing herself three times in the abdomen and cutting her wrist. The state's evidence shows that at 7:40 that morning, the defendant dialed "911" and "calmly" requested that the police and an ambulance be sent to her residence, stating that she had cut herself and was bleeding to death.
Emergency medical personnel arrived on the scene within minutes of the defendant's call. Upon being asked by a firemedic if she "did it," the defendant "nodded" and, in response to the question "why," said something about her husband. At that time the defendant was described as "alert" in the sense that she was able to communicate and was breathing. The defendant was slow moving and slow talking — conditions compatible with a person's going into shock. She was "relatively calm" but appeared to be in pain. The infant was dead.
The defendant and her husband were specialists in the United States Army and were stationed at Fort McClellan, Alabama. At 6:30 on the morning of the murder, Minerva Williamson, the "child care provider" who kept the defendant's daughter during the week and at other times on a regular basis, telephoned the defendant and asked her to bring some fresh doughnuts when she brought her daughter. Ms. Williamson did not notice anything unusual about the defendant's voice.
The day before the murder, on October 20, the defendant had brought her daughter to Ms. Williamson around 7:30 p.m. After playing bingo, the defendant returned around 9:00 and stayed about 15 minutes. Ms. Williamson did not notice anything unusual about the defendant.
Between 7:20 and 7:30 on the morning of the murder, the defendant telephoned Ms. Williamson and said, "Jessicake, Jessicake." This was how Ms. Williamson referred to the victim, Jessica. The defendant said, "I got to go. I'll call you back." Ms. Williamson testified that the defendant seemed to be "a little upset" at this time.
Ms. Williamson had known the defendant for about a year. The defendant had never complained to her about headaches, blackouts, or other physical problems. Ms. Williamson, who testified in the state's case on rebuttal, stated that on the night of the 20th, the defendant appeared sane.
When the police and firemedics arrived, they found the following note, which had been written by the defendant:
 "Will [the defendant's husband], I'm sorry for messing up your credit. I've waited and waited to hear from them but no hope. You would probably never leave us to straighten out your credit, but I want you to have your new car that you want so badly. It looks like you will never get it, married to me. So now maybe everything will be wiped clean. I don't want to go, but it's the only way to get everything paid out. If my car gets paid off, please give it to Jonathan [the defendant's son by her first marriage] and tell him that I love him. No one could see the depression, the hurt that I feel for ruining everything. I wanted to leave Jessica but how could I? Forgive me for being selfish and taking her too. I know the Lord knows my heart and my sorrow. Please bury us in one casket together. I hope things get all right for you soon. We love you, Dee and Jessica."
Written in the margins of the paper were: "Call Ms. Cobb, 1-594-5622; Sergeant Wallace, 820-1511; Dodie [Ms. Williamson], 820-9611. Call Mom and Jonathan and Daddy, 1-804-861-2553, I love them so much. Sue United VA for your credit and for driving me to this even though we sent them the letter."
The defendant was released from the hospital on November 21, 1987, and was then imprisoned in the Calhoun County jail. She was examined at the Taylor Hardin Secure Medical Facility in February 1988. She returned to active military duty in April 1988.
Shortly before the homicide, the defendant's husband had attempted to purchase *Page 747 
an automobile and had discovered that his credit was bad. Unknown to Mr. Ellis at that time, the cause of this trouble was a $4000 judgment a bank had obtained against the defendant for a delinquent VISA bill which apparently had originated from the defendant's second marriage.
Mr. Ellis testified that the defendant suffered some fairly severe headaches immediately preceding the murder. He stated that these were caused by the medication previously prescribed by doctors for the defendant's headaches. Mr. Ellis testified that the defendant did not mention blackouts or memory lapses and that he had no indication that she was depressed. He stated that he "never saw Phil sad or depressed" and that "if she was depressed she wasn't to [him]."
The state presented no expert testimony on the defendant's mental condition at the time of the homicide.
Both the defendant and her mother, Daisey Mae Davis, testified for the defense. Their testimony revealed that the defendant was first married when she was 16 years old. She dropped out of high school and had a son, Jonathan, who was 16 years old at the time of the trial.
According to the defendant, in 1978, she was working as an assistant manager and eventually as a manager at a Church's fried chicken restaurant in Virginia. She began to experience terrible headaches. A doctor told her that she needed to work fewer hours and just take aspirin, but warned her that she could have a stroke if she continued under that kind of pressure. The doctor "mentioned about the hairline vein that [the defendant] had on the right temple," but did not describe the headaches as migraine.
In 1979, the defendant lost the manager's position, apparently through no fault of her own. She continued to work at Church's for about one week although she was "devastated" and very, very upset over the loss of the position. Then, one day after work, the defendant got in her car and "just drove." The next thing she remembered was waking up in a motel room in Maryland and not knowing how she got there. During this time, she considered suicide, and she expressed this to her mother.
After a divorce from her first husband, the defendant married Oscar Grant in 1981. Grant was very jealous and subjected the defendant to physical and mental abuse, including sexual assault and rape. During this marriage the defendant began having headaches again. The marriage ended in 1984 in a divorce, which was recommended by a marriage counselor. After that marriage, the defendant joined the United States Army. She married Mr. Ellis in 1985, and Jessica was born in August 1986. During her pregnancy with Jessica, the defendant had "blackouts" and began to get headaches. The doctors told her that the blackouts were a result of hyperventilation.
In September 1987, the defendant learned that her parents were having marital difficulties and that her father had been involved in a long-term extramarital affair which had resulted in three children. The defendant testified that she felt shocked, hurt, and betrayed.
Also in September 1987, Mr. Ellis needed a better automobile and the defendant suggested he buy one. The defendant handled all the finances in her family. Mr. Ellis was refused credit because of the delinquent VISA account. During this time, the credit card company was sending the defendant letters. The defendant was worried because the credit difficulties might affect her upcoming promotion to sergeant.
In October 1987, the defendant had pneumonia and had difficulty sleeping. She was taking several over-the-counter medications for her pneumonia. She began to experience headaches again. The defendant testified: "Just at that time it just seemed like everything was my fault. It was my fault that [Mr. Ellis] couldn't get his car. It was my fault that we had this — these people calling [about the credit]. But I thought I was handling everything. It just — at that time it didn't seem like it was that severe. I just thought that it was a problem, I was going to handle it. I handled everything . . . in the household." *Page 748 
On the night before the murder, the defendant did not go to sleep. She was awake at 3:30 a.m. when her husband came in from working his shift and went to bed. Sometime after that the defendant began crying and did not know why. Her head began hurting and, although she was thirsty, she could not stand up straight to reach the water faucet. The next thing she remembered was a firemedic talking over her. At trial, the defendant said she did not remember the call from the babysitter at 6:30 that morning, although she had mentioned it to the doctors while in the hospital the night of the offense.
There was no evidence of any marital difficulties between the defendant and her husband. There were no arguments over the financial problems, and by all accounts, Mr. Ellis was generous to his wife. The only indication of discord involved Mr. Ellis's supervisor, a female noncommissioned officer. Mr. Ellis had been to her apartment on one occasion to assemble a stereo set and the defendant had discovered the officer with her husband in their apartment on two other occasions. Mr. Ellis denied being sexually involved with the female officer. The defendant told both the officer and her husband that she did not want the officer in her apartment because it just did not "look right."
The only expert testimony about the defendant's mental condition was presented by the defense. Captain Cesar Yamill Figueroa was a board "eligible" but not "certified" psychiatrist and the chief of the Community Health Service at Fort McClellan. He had psychiatric training but had not taken the "boards." He first interviewed the defendant on October 22, 1987, the day after the homicide. At that time, Dr. Figueroa concluded that the defendant was significantly and remarkably depressed, with evidence of tearfulness and some evidence of derealization, but "no clear evidence of psychotic thought processes." Although the defendant was coherent and understood the magnitude of what had happened, she did not understand how it happened and she did not recall what had happened, according to Dr. Figueroa.
Dr. Figueroa treated the defendant until August 1989, when she separated from the Army. In his opinion, he was "dealing with a major affective disorder, a major depression, that has gone into such an intensity or severity that it went into probably psychotic proportions." He gave his opinion that the defendant was suffering from major depression with psychotic features, that she lacked the substantial capacity to appreciate the criminality of her conduct, and that she did not have the substantial capacity to conform her conduct to the requirements of the law: "I'm saying I think she suffered major depression in the past. She had a transient psychotic episode probably, and after that she came out of the psychotic state and was able to cooperate, and she still had the depression." He stated that "probably" the pain the defendant experienced after stabbing herself and the sight of her slain daughter "got into her and she had enough judgment left to do what [she] was supposed to do, call for help." Dr. Figueroa candidly admitted that his diagnosis was "an opinion, . . . which has a lot of possibility in it." His opinion was based upon his interviews with the defendant and the information he had obtained from the defendant, her parents, her husband, and the babysitter. He testified that Mr. Ellis agreed with the defendant's mother that the defendant had appeared depressed in the past but that he did not recall that the defendant had behaved abnormally in the past.
Dr. Figueroa acknowledged that there was "a possibility" that the defendant, although suffering from major depression, could appreciate the criminality of her act and could conform her conduct to the requirements of law. However, he also testified that the fact that the defendant attempted suicide by stabbing herself "strongly suggested the fact that she was not really aware of what's going on and the consequences of what would happen."
Dr. Beverly Denise Bell was a licensed clinical psychologist employed at the Taylor Hardin Secure Medical Facility. She examined the defendant in February 1988, pursuant to a pretrial order of the trial court. *Page 749 
She testified that, in her opinion, the defendant, at the time of the crime, "was experiencing major depression and at some point in time those symptoms of depression [sad effect, feelings of hopelessness, feelings of guilt, disturbance in sleep and appetite] might have reached psychotic proportion, meaning that she might have for a period of time lost contact with reality, lost complete understanding of her behavior." She concluded that the defendant's character "is to deny problems, and probably underreport distress." The defendant was likely to "internalize" difficulties and blame herself. Dr. Bell testified that the defendant "probably had difficulties with depression, difficulties coping with stress, maybe above and beyond what people close to her might have realized." There was evidence that while at Taylor Hardin, the defendant was "attempting to appear better off psychologically than she actually was."
Dr. Bell noted: "It's my opinion that Ms. Ellis had been living under extreme stress for an extended period of time and there was a cumulative effect of a number of stressors coming together at the same time that had exceeded her tolerance." The defendant was suffering from major depression with psychotic features: "It's my opinion that the psychosis was basically a loss of contact with reality and was transient in nature. It's not my opinion that she was psychotic."
Dr. Bell testified that in her opinion the defendant did not have the substantial capacity to understand the criminality of her conduct and to conform her conduct to the requirements of the law, and that her inability to do so was impaired by symptoms of her mental illness. Dr. Bell candidly admitted that, even though her opinion was to the contrary, the defendant "could have" appreciated the criminality of her conduct and could have conformed her conduct to the requirements of the law even though she was suffering from major depression with psychotic features.
In the forensic evaluation report dated March 8, 1988, Dr. Bell concluded: "[I]t appears that Ms. Ellis was likely experiencing symptoms of major depression that may have reached psychotic proportions during the time in question. . . . Thus, the available information suggests that there is a basis for a mental state defense." At trial, Dr. Bell testified that the defendant was suffering major depression with psychotic features. She could not explain why she omitted the "psychotic features" from her evaluation report.
In addition to Ms. Williamson, the babysitter, the state called two other witnesses to testify in its case on rebuttal. Edward F. Dean, Jr., testified that he was a first sergeant stationed at Fort McClellan, Alabama, and that the defendant was a soldier in his company working as a records clerk in the student military personnel section. He stated that the defendant was a "very good worker," that "her work was always exceptionally well done," and that her "supervisors always applauded and gave her accolades in her duty performance." He testified that the defendant was "happy at that time," and that he never had the impression that she was depressed in any fashion.
Michael B. Moore was the company commander in Headquarters Company, Fort McClellan. He testified that the defendant was one of the better soldiers and that "her day-to-day performance and personal conduct was such that she was one of my good soldiers. She put on a very good appearance, good demeanor, never any complaints." The defendant was going into the Primary Leadership Development Course because she was a good soldier and because of her outstanding work experience. In connection with her promotion to sergeant, the defendant had been scheduled to attend some type of review on the morning of the homicide.
 I
Ellis contends that at trial she established her insanity by clear and convincing evidence and that the verdict of the jury was contrary to the weight of the evidence and was wrong and unjust.
"[I]t is difficult to evaluate the sufficiency of the evidence of a defendant's sanity." *Page 750 United States v. Mota, 598 F.2d 995, 999 (5th Cir. 1979), cert. denied, 444 U.S. 1084, 100 S.Ct. 1042, 62 L.Ed.2d 770 (1980).
 "The difficulty does not lie in the rule, but is inherent in the subject of insanity itself. The practical trouble is for the courts to determine in what particular cases the party on trial is to be transferred from the category of sane to that of insane criminals; where, in other words, the border line of punishability is adjudged to be passed. But, as has been said in reference to an every-day fact of nature, no one can say where twilight ends or begins, but there is ample distinction nevertheless between day and night. We think we can safely rely in this matter upon the intelligence of our juries, guided by the testimony of men who have practically made a study of the disease of insanity; and enlightened by a conscientious desire, on the one hand, to enforce the criminal laws of the land, and, on the other, not to deal harshly with any unfortunate victim of a diseased mind, acting without the light of reason or the power of volition."
Parsons v. State, 81 Ala. 577, 594, 2 So. 854, 864-65 (1887). "Each case must be decided upon its own facts, with careful attention to the weight of the evidence on each side." UnitedStates v. Hall, 583 F.2d 1288, 1293 (5th Cir. 1978).
Any determination of the issue of whether the proof of insanity is so clear, strong, and undisputed that the defendant is entitled to a verdict of not guilty by reason of mental disease or defect must begin with a consideration of the principles collected in Christian v. State, 351 So.2d 623,624-25 (Ala. 1977):
 "We begin by stating the general rule in Alabama that, as persons on trial for commission of crimes are presumed sane, the defense of insanity is an affirmative defense which must be clearly proved to the jury's satisfaction and the burden of proof in this regard rests on the defendant. Ala. Code, tit. 15, § 422 (1958); Knight v. State, 273 Ala. 480, 142 So.2d 899 (1962); Smith v. State, 257 Ala. 47, 57 So.2d 513 (1952); Parrish v. State, 139 Ala. 16, 36 So. 1012 (1903). Thus, where a plea of not guilty by reason of insanity is filed, the burden upon the defendant is to establish the issue of legal insanity by a preponderance of the evidence. Grissom v. State, 33 Ala. App. 23, 30 So.2d 19 (1947); Lee v. State, 246 Ala. 343, 20 So.2d 471 (1944); Lide v. State, 133 Ala. 43, 31 So. 953 (1901). In this respect, the burden never shifts to the State nor rests on the State. Grammer v. State, 239 Ala. 633, 196 So. 268 (1940).
 "In applying these propositions of statutory and case law, it has been stated that the question of insanity at the time of the commission of the crime is a matter to be determined by the jury from a consideration of all the evidence. Carr v. State, 43 Ala. App. 642, 198 So.2d 791 (1967); Hawkins v. State, 267 Ala. 518, 103 So.2d 158
(1958). In making its determination, the jury may reject all expert testimony though it is without conflict. Hockenberry v. State, 246 Ala. 369, 20 So.2d 533 (1945); George v. State, 240 Ala. 632, 200 So. 602 (1941); Parrish v. State, 139 Ala. 16, 36 So. 1012 (1903). However, opinion testimony, even of experts in insanity cases, must be weighed by the jury and may not be arbitrarily ignored. Pickett v. State, 37 Ala. App. 410, 71 So.2d 102, cert. denied, 260 Ala. 699, 71 So.2d 107 (1954); Boyle v. State, 229 Ala. 212, 154 So. 575 (1934).
 "We are cognizant on this appeal of these general rules with respect to pleas of insanity and also of the great weight to be given verdicts of juries. However, an exception must be allowed in cases where the proof of insanity is overwhelming and uncontradicted. This court stated the following in Boyle v. State, 229 Ala. 212, 222, 154 So. 575, 583 (1934):
 " 'Cases of insanity may be so clear, the proof so strong and undisputed, that the jury should be instructed in like form.' "
In the judicial history of this state only a small number of cases have been overturned on appeal on the ground that the jury's guilty verdict was contrary to the *Page 751 
overwhelming weight of the evidence of insanity. See Sistrunkv. State, 455 So.2d 287, 289 (Ala.Cr.App. 1984) (listing seven murder convictions). See also Clark v. State, 475 So.2d 657
(Ala.Cr.App. 1985); Alvis v. State, 434 So.2d 859 (Ala.Cr.App. 1983).
 "In order for this court to reverse, evidence of insanity must be 'overwhelming' . . .; 'uncontradicted,' . . .; and 'clear . . . strong and undisputed' . . . Furthermore, there may be no facts in evidence which would support a reasonable inference that the defendant was sane. . . .
". . . .
 ". . . [I]t is a rare case in which the jury's finding will be disturbed in favor of the appellant's evidence of insanity. Analysis of these cases requires a careful examination of the record in order to determine what, if any, evidence was available from which the jury could reasonably conclude that the defendant knew what he was doing and/or could have controlled his criminal behavior. . . .
". . . .
 "In affirming the trial court's denial of a new trial, we emphasize the deference that must be afforded the discretion of the jury. Theirs was a unique opportunity to observe the live testimony and weigh the evidence in light of the intangible considerations of credibility. This court cannot, in the absence of blatant disregard for the law, substitute itself for the jury."
Sistrunk v. State, 455 So.2d at 289-90.
"[T]he accused is not entitled to a directed verdict on the issue of insanity unless the evidence of insanity is clear, strong, and undisputed. Boyle v. State, 229 Ala. 212, 222,154 So. 575 (1934)." Cunningham v. State, 426 So.2d 484, 486
(Ala.Cr.App. 1982).
 "When the accused has offered evidence sufficient to overcome the presumption of sanity, the State is not required to prove his sanity. Howard v. State, 172 Ala. 402, 408, 55 So. 255
(1911). Insanity is an affirmative defense which must be proven by the defendant to the reasonable satisfaction of the jury. The burden of proving insanity never shifts to the State but remains on the defendant throughout the trial. Grammer v. State, 239 Ala. 633, 196 So. 268 (1940). '[A] reasonable doubt of sanity, raised by all the evidence, does not authorize an acquittal.' Boswell, [v. State, 63 Ala. 307, 326 (1927)]. 'It would be an anomaly to require the State to prove a fact which the law presumes to exist, and to authorize such fact to be overturned by the injection into the case of a reasonable doubt of its existence. Such is not the law.' Maxwell v. State, 89 Ala. 150, 164, 7 So. 824 (1890). 'Thus, where the whole evidence does not satisfy the minds of the jury that the accused is insane at the time of the commission of the crime with which he is charged, the jury should convict the defendant, notwithstanding that the medical witnesses were of the opinion that such person was insane.' 31 Am.Jur.2d, Expert and Opinion Evidence, Section 186 (1967)."
Cunningham v. State, 426 So.2d at 490.
In this case, the defendant presented the only experts, and those experts testified that the defendant was insane. However, it is clear that (1) the prosecution need not rebut testimony for the defense that the defendant was insane with its own expert testimony of sanity, and (2) a jury may reject the opinion of an expert, even though that opinion is uncontradicted.
"There is no requirement that the government rebut expert testimony with its own expert. . . . The same result may instead be accomplished by presenting lay witnesses or other evidence, or by cross-examination designed to weaken the defense expert's credibility." United States v. Kennedy,578 F.2d 196, 198 (7th Cir.), cert. denied, 439 U.S. 1049,99 S.Ct. 727, 58 L.Ed.2d 709 (1978). See also United States v. Esle,743 F.2d 1465, 1474 (11th Cir. 1984) ("Where . . . the basis of the expert's opinion has been thoroughly impeached, the court, as fact finder, is thus plainly authorized to reject the opinion entirely").
 "Opinions of experts in the field of mental disorders as to an accused's sanity *Page 752 
or insanity are of course admissible and certainly should be carefully considered by a jury. Such opinion evidence is not, however, conclusive on the jury. The responsibility is upon the jury to weigh all the evidence, expert and lay, pertaining to the issue of the accused's mental competency. The weight to be accorded all such evidence is solely within the jury's province. They may reject it all even though it is without conflict."
Fitzhugh v. State, 35 Ala. App. 18, 26, 43 So.2d 831, 838, cert. denied, 253 Ala. 246, 43 So.2d 839 (1949), cert. denied,339 U.S. 986, 70 S.Ct. 1007, 94 L.Ed. 1388 (1950). As the court noted in Boyle v. State, 229 Ala. 212, 224, 154 So. 575, 586
(1934), however, the jury may not "arbitrarily ignore or reject such testimony."
 "Such evidence is admitted upon the ground that men who have given great study and had much experience are more competent than the layman to form a correct opinion on the question of sanity. It is illogical to say the layman in the jury box may lightly set up his own opinion to the contrary. But the juror must determine first whether the hypotheses upon which the expert opinion is based are proven in substance and effect, and then weigh the expert evidence in connection with other evidence, indulging the presumptions the law declares." Id.
"Expert testimony, even when uncontradicted, is not conclusive on the issue of sanity, . . . and the jury may find such testimony adequately rebutted by the observations of mere laymen." Mota, 598 F.2d at 999. See also Greider v. Duckworth,701 F.2d 1228, 1234 (7th Cir. 1983) ("The jury could credit the testimony of lay witnesses over that of an expert witness");United States v. Emery, 682 F.2d 493, 498 n. 3 (5th Cir.), cert. denied, 459 U.S. 1044, 103 S.Ct. 465, 74 L.Ed.2d 615
(1982) ("The jury can find expert testimony adequately rebutted by the observations of laymen").
 "The Government can meet its burden [in a federal prosecution] through the testimony of lay witnesses. A defendant is not entitled to a judgment of acquittal simply because he offers expert testimony on the issue of insanity and the Government attempts to rebut it without any expert witnesses. The expert's opinion, even if uncontradicted, is not conclusive. At the same time, it may not be arbitrarily ignored, and some reason must be objectively present for ignoring expert opinion testimony."
United States v. Hall, 583 F.2d at 1294 (footnotes omitted).
A factfinder is not bound by expert testimony "even if all of the witnesses are presented by only one side." United States v.Pitts, 428 F.2d 534, 536 (5th Cir.), cert. denied,400 U.S. 910, 91 S.Ct. 154, 27 L.Ed.2d 149 (1970). Such evidence
 "may be rebutted by showing the incorrectness or inadequacy of the factual assumptions on which the opinion is based, 'the reasoning by which he progresses from his material to his conclusion,' . . . inconsistencies or contradictions in his testimony as to material matters, [and] material variations between the experts themselves. . . . In some cases, the cross examination of the expert may be such as to justify the trier of fact in not being convinced by him. One or more of these factors may, depending on the particular facts of each case, make a jury issue as to the credibility and weight to be given to the expert testimony."
Mims v. United States, 375 F.2d 135, 14344 (5th Cir. 1967) (footnotes omitted).
Although "a factfinder need not adhere to an expert opinion on incompetency if there is reason to discount it,"Strickland v. Francis, 738 F.2d 1542, 1552 (11th Cir. 1984), "the jury cannot arbitrarily ignore the experts in favor of the observations of laymen," id., and must have an "objective reason," to disregard the expert's opinion which is rebutted only by lay testimony. Wallace v. Kemp, 757 F.2d 1102, 1109
(11th Cir. 1985).
 "In making this judgment [to disregard the expert's opinion], the court should consider
 (1) the correctness or adequacy of the factual assumptions on which the expert opinions are based; *Page 753 
 (2) possible bias in the experts' appraisal of the defendant's condition;
 (3) inconsistencies in the experts' testimony, or material variations between experts; and
 (4) the relevance and strength of the contrary lay testimony.
 Strickland, 738 F.2d at 1552; Brock [v. United States,] 387 F.2d [254, 258 (5th Cir. 1967)] (quoting Mims v. United States, 375 F.2d 135, 143-44 (5th Cir. 1967))."
Wallace v. Kemp, 757 F.2d at 1109.
The jury may have an objective reason to disregard the expert's opinion if it concludes that the expert based his findings solely on the defendant's description of his own symptoms, without verification by psychological testing and absent a past history of mental illness:
 "The adequacy of the factual basis for an expert's opinion also might be challenged if the expert relies only on the defendant's subjective description of his symptoms. See Mims v. United States, 375 F.2d at 145. The clear danger is that the defendant has a strong interest in portraying his symptoms in a fashion that will support his claim of mental incompetency. Id. See also United States v. Mota, 598 F.2d 995, 999 (5th Cir.) (expert testimony disregarded when based on a single interview through interpreter, in which doctor was unable to verify truth of defendant's statements to him and unable to conduct psychological tests), cert. denied, 444 U.S. 1084, 100 S.Ct. 1042, 62 L.Ed.2d 770 (1979); United States v. Makris, 535 F.2d [899, 908 (5th Cir. 1976)] (disregarding expert opinion on competency in part because doctors relied only on statements by defendant and they were not aware of defendant's legal problems); Mims v. United States, 375 F.2d at 145 (significant in upholding disregard of expert testimony from psychiatrist who relied solely on defendant's statements, was [sic] absence of any history of mental illness)."
Strickland v. Francis, 738 F.2d at 1553.
In this case, it would appear that the very act of the killing indicates that the defendant must have been insane, and we are inclined to find as we did in Clark, supra, and Alvis, supra, that the defendant's "actions were so bizarre, unprovoked, and without a rational basis that there was no evidence from which the jury could reasonably infer that [the defendant] was sane when the [stabbing] occurred." Clark,475 So.2d at 659. Accord, Alvis, 434 So.2d at 864. However, "[a]lthough there seems to be one school of thought to the effect that one who commits a crime is necessarily to some extent so mentally deranged as to excuse or mitigate the crime and that the worse the crime the greater the derangement, such sentimentalism finds no support in law or logic." Barfield v.State, 54 Ala. App. 15, 22, 304 So.2d 257, 263 (1974).
 "In face of the settled doctrines reflected in the above cases we are unwilling, indeed we think without the power or authority, to accord to appellant's counsel's insistence that the very fact that a young mother would kill her infant son is so contrary to all laws of maternal instinct and to the laws of nature as to establish, by its terrible enormity, the insanity of the mother. Even though a trial judge, or the members of an appellate court may have reached a conclusion different from that of the jury had a case been presented to him or them for an original decision, such does not warrant a reversal of a cause in which a jury, exercising their solemn prerogative to determine the issues has rendered a verdict which is supported by substantial evidence, and which verdict cannot rationally be said to be arbitrary."
Fitzhugh v. State, 35 Ala. App. at 27, 43 So.2d at 839.
"Care must be maintained, . . . that in commiserating and protecting this pitiable class [of the insane], which appeals so loudly to our sympathies, we do not break down all legal barriers to crime, and leave society at the mercy of those whose evidence of insanity consists in their supreme depravity." Boswell v. State, 63 Ala. 307, 316 (1879). *Page 754 
After conscientious and repeated review of the evidence in this case, we conclude that the jury did not arbitrarily disregard the experts' opinions of insanity. The record shows that after deliberating 52 minutes, the jury requested instructions "concerning the defendant's ability to control actions and to know actions were in violation of Alabama law." Eighteen minutes after the trial judge reinstructed the jury on the law of insanity, the jury returned its guilty verdict.
In this case, the proof of insanity was not clear and convincing, despite the fact that two medical experts concluded that the defendant was insane. While Dr. Figueroa did testify that in his opinion the defendant was insane, he repeatedly emphasized the fact that his opinion was only "a probability" which "had a lot of possibility in it." Although we recognize that "no human being has or can have accurate knowledge of the true answer to [the] question" of whether or not the defendant was insane at the time of the crime, Lee v. State, 246 Ala. 343,345, 20 So.2d 471, 473 (1944) cert. denied, 325 U.S. 888,65 S.Ct. 1576, 89 L.Ed. 2002 (1945), the certainty with which an expert expresses or holds an opinion is a factor the jury may consider in determining credibility and in deciding what weight to give the expert's testimony. Both experts admitted that it was possible that the defendant could have been sane when the crime occurred. For the most part, both experts relied primarily upon information obtained from the defendant and her mother in forming their opinions. Both experts indicated that the defendant had not informed them of certain facts we consider significant that the defendant related to the jury from the witness stand concerning her past psychological history. The jury could have concluded that the defendant's trial testimony about incidents she neglected to tell the mental health professionals about was manufactured, or at least creatively remembered, in light of her later becoming aware of the textbook symptoms of major depression.
There is also an indication that the jury could have rejected the experts' conclusions because the jury determined the information supplied to the experts by the defendant, and upon which the experts' opinions were based, was in fact incorrect. Although the defendant and her mother testified that the defendant had severe disabling headaches and deep depression involving memory loss and blackouts, the defendant's husband, the babysitter, and the defendant's superiors in the military indicated that the defendant had never appeared depressed and was highly efficient in her job. The experts' testimony that the defendant was insane at the time of the crime "may be strongly persuasive; but it can hardly be said to be conclusive." Howard v. State, 172 Ala. 402, 409, 55 So. 255,257 (1911).
"[I]nsanity is a defense which must be established to the satisfaction of the jury, by a preponderance of the evidence, and a reasonable doubt of the defendant's sanity, raised by all the evidence, does not authorize an acquittal." Ford v. State,71 Ala. 385, 392-93 (1882). See also Gunter v. State, 83 Ala. 96,107-08, 3 So. 600, 605-06 (1888); Maxwell v. State, 89 Ala. 150,164, 7 So. 824, 829 (1890). "Presentation of a mere reasonable doubt of sanity does not authorize an acquittal."Sistrunk, 455 So.2d at 289.
"It is basic that in consideration of the sufficiency or insufficiency of the evidence to support the verdict, we cannot weigh the evidence or test the credibility of the witnesses."Walker v. United States, 301 F.2d 94, 95 (5th Cir. 1962). "[W]here there is ample evidence offered by the state to support a verdict, it should not be overturned even though the evidence offered by the defendant is in sharp conflict therewith and presents a substantial defense." Fuller v. State,269 Ala. 312, 333, 113 So.2d 153, 172 (1959), cert. denied,361 U.S. 936, 80 S.Ct. 380, 4 L.Ed.2d 358 (1960).
 "In reviewing the sufficiency of the evidence in criminal cases, we are to view the evidence and all inferences that may reasonably be drawn from it in a light most favorable to the government. . . . Whether evidence is direct or circumstantial, we must accept all credibility choices *Page 755 
that tend to support the jury's verdict. . . . The standard of review is whether a reasonably minded jury must necessarily have entertained a reasonable doubt of the defendant's guilt. If the jury could not reasonably have concluded that the evidence excluded every reasonable hypothesis but that of guilt, then we must reverse the convictions."
United States v. Hinds, 662 F.2d 362, 366 (5th Cir. 1981), cert. denied, 455 U.S. 1022, 102 S.Ct. 1720, 72 L.Ed.2d 140
(1982).
In dealing with the issue presented on this appeal, we recognize the distinction between the "weight" of the evidence and the "sufficiency" of the evidence.
 "The weight of the evidence is clearly a different matter from the sufficiency of the evidence. The sufficiency of the evidence concerns the question of whether, 'viewing the evidence in the light most favorable to the prosecution, [a] rational fact finder could have found the defendant guilty beyond a reasonable doubt.' Tibbs v. Florida, 457 U.S. 31, 37, 102 S.Ct. 2211, 2216, 72 L.Ed.2d 652 (1982). Accord Prantl v. State, 462 So.2d 781, 784 (Ala.Cr.App. 1984). . . .
 "In contrast, '[t]he "weight of the evidence" refers to "a determination [by] the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than the other."' Tibbs v. Florida, 457 U.S. at 37-38, 102 S.Ct. at 2216 (emphasis added). We have repeatedly held that it is not the province of this court to reweigh the evidence presented at trial. E.g., Franklin v. State, 405 So.2d 963, 964 (Ala.Cr.App.), cert. denied, 405 So.2d 966 (Ala. 1981); Crumpton v. State, 402 So.2d 1081, 1085 (Ala.Cr.App.), cert. denied, 402 So.2d 1088 (Ala. 1981); Nobis v. State, 401 So.2d 191, 198 (Ala.Cr.App.), cert. denied, 401 So.2d 204 (Ala. 1981). ' "[T]he credibility of witnesses and the weight or probative force of testimony is for the jury to judge and determine." ' Harris v. State, 513 So.2d 79, 81 (Ala.Cr.App. 1987) (quoting Byrd v. State, 24 Ala. App. 451, 136 So. 431 (1931)). In this case the conflicting evidence offered by the state and by [the defendant] simply presented a jury question, Gunn v. State, 387 So.2d 280, 282 (Ala.Cr.App.), cert. denied, 387 So.2d 283 (Ala. 1980), and the verdicts rendered thereon are conclusive on appeal, Roberson v. State, 162 Ala. 30, 32, 50 So. 345, 346 (1909); Bragg v. State, 518 So.2d 847, 849 (Ala.Cr.App. 1987)."
Johnson v. State, 555 So.2d 818, 819-20 (Ala.Cr.App. 1989).
Although the courts of this state have almost consistently employed the terms "weight" and "sufficiency" interchangeably and synonymously, e.g., Gantt v. State, 356 So.2d 707, 712
(Ala.Cr.App.), cert. denied, 356 So.2d 712 (Ala. 1978), and on occasion, appear even to have treated the substantive issue presented on this appeal as a hybrid or mixed question involving both weight and sufficiency, see Ex parte Turner,455 So.2d 910 (Ala. 1984), we consider the present question one of sufficiency rather than weight.
The oft-quoted passage, "Cases of insanity may be so clear, the proof so strong and undisputed, that the jury should be instructed in like form," first appeared in Boyle v. State,229 Ala. at 222, 154 So. at 583. That sentence is followed by a caution:
 "But courts should be careful not to invade the province of the jury in cases of this character. Although the evidence may be offered only by the defense, and all tend to one conclusion, yet, in view of the presumption of sanity, if the evidence is inconclusive, and reasonable inferences may be drawn that the act was that of a sane man as defined by law, the affirmative charge should be refused.
 "This is but to apply the oft-stated general rule defining the functions of court and jury. We see no sound reason to devise a different rule in insanity cases. The inherent difficulties in considering such issue apply to the jury, the same as the court. Howard v. State, 172 Ala. 402, 55 So. 255, 34 L.R.A. (N.S.) 990."
Boyle v. State, 229 Ala. at 222, 154 So. at 583. *Page 756 
In Howard, 172 Ala. 402, 55 So. 255 (1911), two physicians testified as experts that the accused was insane at the time of the criminal act. The appellate court found that evidence "persuasive" but "hardly . . . conclusive." Howard,172 Ala. at 409, 55 So. at 257. The court determined that "there was before the jury substantial evidence from which they might rationally infer that defendant's mental infirmities did not obscure his intelligence, nor destroy his free agency, in relation to the act with which he stands charged, and the issue was properly submitted to the jury." Howard, 172 Ala. at 410, 55 So. at 257. That "substantial evidence" was the defendant's own testimony at trial, which included his "complete narrative of the res gestae of the homicide itself." Id. Yet, in other cases, a defendant's demeanor in testifying may reinforce the only reasonable inference from the other evidence, that the defendant was insane. Pickett v. State, 37 Ala. App. 410, 415,71 So.2d 102, 107 (1953), cert. denied, 260 Ala. 699,71 So.2d 107 (1954). When a defendant takes the witness stand "the jury [is] afforded the 'fruitful opportunity' to form an estimate of his mental condition and to view, in some measure at least, the operations and perceptions of his mind." Herbert v. State,357 So.2d 683, 689-90 (Ala.Cr.App.), cert. denied, 357 So.2d 690
(Ala. 1978). Here, the jury also had that opportunity and evidently chose to disbelieve portions of the defendant's testimony which would have supported her insanity plea.
"[T]he duty remains in this Court 'to revise the verdict of juries and the conclusions of trial judges on questions of fact, where, in our opinion, after making all proper allowances and indulging all reasonable intendments in favor of the court below, we reach a clear conclusion that the finding and judgment are wrong." Kelly v. State, 273 Ala. 240, 244,139 So.2d 326, 330 (1962). "The role of appellate courts is not to say what the facts are. Our role, . . . is to judge whether the evidence is legally sufficient to allow submission of an issue for decision to the jury." Bankston v. State, 358 So.2d 1040,1042 (Ala. 1978). "The rule is clearly established in this State that a verdict of conviction should not be set aside on the ground of the insufficiency of the evidence to sustain the verdict, unless, after allowing all reasonable presumptions of its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince the court that it was wrong and unjust." Bridges v. State, 284 Ala. 412, 420,225 So.2d 821, 829 (1969).
 "Neither the trial court, nor this court on review, can usurp the province of the jury in weighing the evidence and passing upon the credibility of the witness, and if the evidence, and the inferences to be reasonably drawn therefrom, are sufficiently substantial to support the finding of the jury, it should not be overthrown and held for naught simply because the judges reviewing the finding on the evidence possibly, or even probably, may have arrived at a conclusion different from the conclusion of the jury. This duty does not rest upon the reviewing court and is not to be included in its functions. This responsibility is solely upon the jury, the members of which have seen and heard the witnesses, and are in [a] position to sift the truth from live testimony far better than a reviewing court can perform this function by reading such testimony in cold type in a record."
Autry v. State, 34 Ala. App. 225, 229-30, 38 So.2d 348, 351
(1949).
"This court cannot undertake to reconcile the conflicting testimony of witnesses on the trial or to weigh the evidence, except in such cases where the great and overwhelming weight of the evidence convinces the court that the verdict was the result of influences not properly considered." Freeman v.State, 21 Ala. App. 629, 630, 111 So. 188, 189 (1927). Here, the jury unravelled the complex emotional testimony in the case at bar and concluded either that the defendant was not suffering from a mental disease or defect or that the disease or defect did not substantially affect her capacity to appreciate the criminality of her conduct or to conform her conduct to the requirements of law. While the members *Page 757 
of this court might have reached a different verdict on the same evidence presented, we cannot say that the juryarbitrarily ignored the expert testimony before it. From the different versions of the defendant's past psychological history related to her doctors and to the jury from the witness stand, and from the candid admission of uncertainty by the doctors themselves regarding the defendant's ability to appreciate the criminality of her conduct and to conform her conduct to the requirements of the law, the jury was given objective — not arbitrary — reasons to discount the experts' testimony.
 II
The defendant insists that the trial court erred by allowing state's witness Minerva Williamson to give her opinion that the defendant was sane. She claims that no proper predicate was established to show that Ms. Williamson had the opportunity to observe the defendant during the time in question and to form an opinion of her mental condition.
"The law is clear that a notion to the effect that only an expert witness can testify that in his opinion another is sane is erroneous." Kennedy v. State, 371 So.2d 464, 466
(Ala.Cr.App. 1979).
 "In Alabama, a lay witness may give his opinion on the question of a defendant's sanity or insanity as long as the proper predicate has been laid. Williams v. State, 291 Ala. 213, 279 So.2d 478 (1973); Lokos v. State, 434 So.2d 818
(Ala.Cr.App. 1982), affirmed, 434 So.2d 831 (Ala. 1983); Carroll v. State, 370 So.2d 749
(Ala.Cr.App.), cert. denied, 370 So.2d 761 (Ala. 1979). To lay a proper predicate for the admission of such an opinion, a witness must first have testified . . . to facts showing that he had an adequate opportunity to observe such defendant's conduct in general. . . ."
Ex parte Lee, 506 So.2d 301, 303 (Ala. 1987).
"Of course, in making the determination as to whether the witness has had an adequate opportunity to observe such defendant's conduct so as to render his opinion admissible, much is left to the sound legal discretion of the trial court."Ex parte Lee, 506 So.2d at 303. See also Lokos v. State,434 So.2d 818, 829 (Ala.Cr.App. 1982), affirmed, 434 So.2d 831
(Ala. 1983) ("Whether the witness has acquired such a qualifying knowledge of the [defendant] is a matter within the sound discretion of the trial judge"). " ' "The very nature of the test requires that its determination in particular cases be left to the sound discretion of the trial court, * * * which will not be revised on appeal, except for palpable abuse." No precise rule can be established as to the length or character of acquaintance necessary for qualification.' " Farley v.State, 34 Ala. App. 54, 58, 37 So.2d 434, 437, cert. denied,251 Ala. 391, 37 So.2d 440 (1948) (quoting Bass v. State, 219 Ala. 282,285, 122 So. 45, 48 (1929)).
Here, Ms. Williamson testified that she had known the defendant for about a year, had had the opportunity to see her every weekday, and occasionally on the weekend, when the defendant came to pick up her daughter, Jessica. During that period of time, the witness had observed nothing unusual in the defendant's behavior. The witness had kept the defendant's daughter on October 20, 1987, the night before the homicide, while the defendant played bingo until 9:00 p.m., and on that occasion, Ms. Williamson observed no unusual behavior by the defendant.
Based on the foregoing predicate, the trial court allowed the witness to give her opinion that "on the evening of October the 20th of 1987," the defendant was sane. The trial court was well within its discretion in determining that the predicate was sufficient.
 III
The defendant filed a written waiver of jury trial. The waiver was not opposed by the prosecution. The court, however, refused to accept the defendant's waiver and kept the case on the jury docket. Ellis claims that the right to a jury trial and, correlatively, the right to waive a *Page 758 
jury trial, may not be infringed by the trial judge.
It is clear that a defendant has no absolute constitutional right to a non-jury trial. Singer v. United States,380 U.S. 24, 34, 85 S.Ct. 783, 789, 13 L.Ed.2d 630 (1965). See alsoUnited States v. Jackson, 390 U.S. 570, 88 S.Ct. 1209,20 L.Ed.2d 138 (1968); Patton v. United States, 281 U.S. 276,50 S.Ct. 253, 74 L.Ed. 854 (1930). In Singer, the Court observed that "[t]he ability to waive a constitutional right does not ordinarily carry with it the right to insist upon the opposite of that right," 380 U.S. at 34-35, 85 S.Ct. at 790, and it held that there was "no constitutional impediment to conditioning a waiver of this right [to trial by jury] on the consent of the prosecuting attorney and the trial judge when, if either refuses to consent, the result is simply that the defendant is subject to an impartial trial by jury — the very thing that the Constitution guarantees him," 380 U.S. at 36,85 S.Ct. at 790.
The Alabama courts have followed this line of authority.See Singleton v. State, 288 Ala. 519, 523, 262 So.2d 768, 772
(1971) (remanding with directions "to determine whether the accused knowingly and intelligently waived his right to trial by jury, whether the State consented to such waiver, and whether the trial court reasonably approved of such waiver");Shields v. State, 52 Ala. App. 690, 695, 296 So.2d 786, 789, cert. denied, 292 Ala. 749, 296 So.2d 793 (1974); Green v.State, 51 Ala. App. 654, 655, 288 So.2d 191, 191-92 (1974).
The Singer Court added the following caution to its finding that waiver of jury trial was subject to the approval of the prosecution and the trial court:
 "We need not determine in this case whether there might be some circumstances where a defendant's reasons for wanting to be tried by a judge alone are so compelling that the Government's insistence on trial by jury would result in the denial to a defendant of an impartial trial. Petitioner argues that there might arise situations where 'passion, prejudice . . . public feeling' or some other factor may render impossible or unlikely an impartial trial by jury. However, since petitioner gave no reason for wanting to forgo jury trial other than to save time, this is not such a case, and petitioner does not claim that it is."
Singer, 380 U.S. at 37-38, 85 S.Ct. at 791 (omission in original) (footnote omitted).
Here, the defendant's written waiver of jury trial stated no reasons for the election other than her "confidence . . . that the court [would] render a fair and impartial verdict . . . free of passion, prejudice, and/or fear of later public criticism." The trial court's order declining to accept the waiver recited the fact that a pretrial conference was held, at which time there was "a full and frank discussion" and "argument made." Defendant claims on appeal that she sought to waive jury trial "in order to seek a dispassionate view of the evidence and applicable law, in order to avoid a verdict that was tinged with prejudice due to the nature of the case." Brief of Appellant at 27.
While the dictum in Singer leaves open the possibility that this case could have presented the trial court with reasons for defendant's waiver "so compelling" that insistence on a jury trial could have resulted in the "denial to defendant of an impartial trial," this court was not privy to the "full and frank discussion" or to the arguments of counsel at the pretrial conference. We must, of necessity, therefore, repose in the trial judge much confidence and rely on his informed discretion here.
 "[T]he maintenance of the jury as a factfinding body in criminal cases is of such importance and has such a place in our traditions, that, before any waiver can become effective, the consent of government counsel and the sanction of the court must be had, in addition to the express and intelligent consent of the defendant. And the duty of the trial court in that regard is not to be discharged as a mere matter of rote, but with sound and advised discretion, with an eye to avoid unreasonable or undue departures from the mode of trial or from any of the essential elements thereof, and with a caution increasing in *Page 759 degree as the offenses dealt with increase in gravity."
Patton v. United States, 281 U.S. at 31213, 50 S.Ct. at 263
(emphasis added).
One commentator has summarized the arguments in favor of requiring the trial court's consent to jury waiver as follows: "[T]he judge should be . . . involved so that he can protect the defendant, protect himself from criticism regarding the outcome of the case, obtain valuable input on matters of witness credibility and community standards, and ensure that juries continue to have a role in criminal proceedings." W. LaFave J. Israel, Criminal Procedure § 21.1(h) at 704-05 (1984).
Here the trial judge responded to the concerns implicit in these arguments and to the directive of Patton, supra, when he ordered "that a charge of the type present in this case should be heard by an impartial jury who determines the facts in controversy." It is evident from his order that the trial judge considered not only the discussions and arguments made at the pretrial conference, but also the value of jury input, and the gravity of the charged offense in deciding to reject defendant's waiver. We therefore cannot find that he abused his discretion. See generally Annot., 37 A.L.R. 4th 304 (1985). Cf.Ex parte Boswell, 558 So.2d 918, 921 (Ala. 1990) ("[T]he State is not a party entitled to a trial by jury on a misdemeanor appeal. . . .").
 IV
Ellis argues that the suicide note written to her husband was a confidential communication admitted in violation of the common law privilege for marital communications. The marital privilege ceased, however, at the moment the note was found "on the floor in front of the television set" by the police and firemedics who answered the "911" emergency call.
"The weight of decision seems to support the view that the privilege does not protect against the testimony of third persons who have . . . secured possession or learned the contents of a letter from one spouse to another by interception. . . ." E. Cleary, McCormick on Evidence § 82 at 196 (3d ed. 1984). See 8 J. Wigmore, Evidence § 2339 at 668 (McNaughton rev. 1961); C. Gamble, McElroy's Alabama Evidence § 103.01(4) at 226-27 (3d ed. 1977); Annot., 32 A.L.R. 4th 1177 (1984) (applicability of marital privilege to written communications between spouses inadvertently obtained by third persons). Cf. Howton v. State, 391 So.2d 147, 150 (Ala.Cr.App. 1980) (letter from spouse to incarcerated defendant which was opened and read by jailhouse officer not privileged); Phillipsv. State, 11 Ala. App. 168, 173, 65 So. 673, 675 (1914) (conversation between spouses overheard by eavesdropper not privileged).
The trial court's ruling that the letter was admissible was correct.
 V
Finally, Ellis contends that the trial court erred by admitting into evidence a picture of Jessica Ellis's dead body showing the "14 month-old female child turned on her side on a bed, with eight large stab wounds visible on her back and with the sheet showing a large bloodstain and blood oozes from the open wounds." Brief of Appellant at 31. The defendant claims that because neither the identity of the victim nor the cause of her death was at issue under the defendant's plea of insanity, the photographic evidence was introduced solely to inflame the jury.
In Walker v. State, 416 So.2d 1083, 1089-90 (Ala.Cr.App. 1982), this court observed the following:
 "Photographs which depict the character and location of external wounds on the body of a deceased victim are admissible even though they are cumulative evidence based upon an undisputed matter. Ellenburg v. State, 353 So.2d 810
(Ala.Cr.App. 1977). The fact that a photograph is gruesome and ghastly is no reason for excluding it, if relevant, even if the photograph may tend to inflame the jury. Carpenter v. State, 400 So.2d 417
(Ala.Cr.App.), cert. denied, 400 So.2d 427 (Ala. 1981)."
See also Kinder v. State, 515 So.2d 55, 64 (Ala.Cr.App. 1986). In Harrell v. State, *Page 760 470 So.2d 1303, 1306 (Ala.Cr.App. 1984), affirmed on other grounds,470 So.2d 1309 (Ala. 1985), cert. denied, 474 U.S. 935,106 S.Ct. 269, 88 L.Ed.2d 276 (1985) this court held that a photograph was not immaterial if it was
 "illustrative of the crime scene and corroborative of the testimony of . . . the first policeman to arrive on the scene. Arnold v. State, 348 So.2d 1092, 1095 (Ala.Cr.App.), cert. denied, 348 So.2d 1097 (Ala. 1977); C. Gamble, McElroy's Alabama Evidence § 123.03(1) (3d ed. 1977). A photograph 'is competent evidence of anything, of which it is competent and relevant for a witness to give a verbal description.' 23 C.J.S. Criminal Law § 852(1)(a) (1961)."
Jacksonville police officer Randy Glenn Lee was one of the first officers on the scene and he described the location and condition of the victim's body. Because his testimony was competent and relevant, the photograph illustrative of his testimony, though "cumulative evidence based on an undisputed matter," was admissible. Harrell v. State, supra; Washington v.State, 415 So.2d 1175, 1180-81 (Ala.Cr.App. 1982).
The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.