[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 147 
The appellant Michael Anthony Lackey was convicted for the capital murder of 87-year-old Nellie Ola Moultrie as defined in Ala. Code 1975, § 13A-5-40(a)(4) (murder/burglary). The trial court accepted the jury's recommendation and sentenced the appellant to life imprisonment without the possibility of parole. The appellant raises two issues on this appeal from that conviction.
 I
In a separate proceeding before the trial of the capital indictment, a jury found the appellant competent to stand trial. See generally Ex parte LaFlore, 445 So.2d 932
(Ala. 1983). After that verdict, defense counsel "move[d] for a judgment of not competent to stand trial NOV." R. 431. The appellant argues that the trial court committed reversible error in denying his "motion for judgment NOV" on the issue of the appellant's competency.
"A competency hearing is a separate and independent proceeding from the criminal trial itself." 22A C.J.S.Criminal Law § 554 at 160 (1989). Because a competency hearing "is in the nature of a civil proceeding," id., the civil procedure motion for judgment notwithstanding the verdict (JNOV) may have been appropriate.
However, we treat the appellant's motion for a judgment notwithstanding the verdict as a motion for a judgment of acquittal after verdict under Rule 20.3, A.R.Crim.P. The Alabama Rules of Criminal Procedure specifically address competency determinations and some of the procedures to be employed at competency hearings. See Rules 11.1-11.5, 11.6(b), A.R.Crim.P. Therefore, we hold that the Alabama Rules of Criminal Procedure, rather than Alabama Rules of Civil Procedure, are generally applicable to competency hearings. See Rules 1(a) and 81, A.R.Civ.P. (excluding from the application of the Rules of Civil Procedure those matters whose proceedings are governed by specific statutes or other rules). Compare Rule 1, A.R.Juv.P. ("If no procedure is specifically provided in these rules or by statute, the Alabama Rules of Civil Procedure shall be applicable to the extent not inconsistent herewith").
The appellant has properly preserved the issue for appeal. Rule 20.3, A.R.Crim.P., "provides that a defendant may make a motion for judgment of acquittal after the jury has returned a verdict, . . . without having made such a motion under Rule 20.2 before submission of the case to the fact-finder. Compare Rule 50(b), A.R.Civ.P., which allows a motion for judgment notwithstanding the verdict only if a motion for directed verdict has been made at the proper time." Rule 20.3, Committee Comments. We now address the merits of the appellant's claim.
"A defendant is mentally incompetent to stand trial . . . if that defendant lacks sufficient present ability to assist in his or her defense by consulting with counsel with a reasonable degree of rational understanding of the facts and the legal proceedings against the defendant." Rule 11.1, A.R.Crim.P. SeeDusky v. United States, 362 U.S. 402, 402, 80 S.Ct. 788, 789,4 L.Ed.2d 824 (1960).
The appellant was arrested on July 10, 1990, and was confined in the Marshall County jail. R. 240. On August 31, 1990, the circuit court ordered that the appellant be evaluated at Taylor Hardin Secure Medical Facility in order to determine his mental state at the time of the offense and his competency to stand trial. C.R. 17-20. On December 3, 1990, Dr. Kathleen A. Rogers, *Page 148 
a staff psychologist at Taylor Hardin, reported to the trial court that she had determined the appellant was incompetent to stand trial and that he should be admitted for treatment. C.R. 230.
The appellant was thereafter admitted to the Taylor Hardin Secure Medical Facility on December 6, 1990. C.R. 231. On March 21, 1991, Dr. James F. Hooper, a Taylor Hardin staff psychiatrist, reported that, in his opinion, the appellant was competent to stand trial. C.R. 232-35, R. 353-55. The appellant was returned to the Marshall County jail on March 25, 1991. R. 241. Finding reasonable grounds to doubt the appellant's competency, the trial court ordered the issue submitted to a jury, and on October 7, 1991, the competency hearing began. Dr. Rogers and Dr. Hooper from the Taylor Hardin Secure Medical Facility were asked by the trial judge to evaluate the appellant immediately before the hearing to determine his "present competency to stand trial." C.R. 348, R. 302-03.
At the competency hearing, the appellant presented expert testimony from the two doctors and lay witness testimony from three employees at the Marshall County jail. The State did not present any witnesses in rebuttal.
Marshall County Chief Deputy Sheriff Lacy Galloway testified that he had seen the appellant on several occasions while the appellant was incarcerated in the county jail. Galloway stated that, in the two or three months before the hearing, he and the appellant had sometimes had "a normal conversation," but at other times, it seemed that the appellant did not "understand what [Galloway] was talking to him about." R. 243. Galloway had noticed the appellant display unusual behavior two or three weeks prior to the hearing. He stated that the appellant would sometimes take off all his clothing in the middle of the day. R. 244. The appellant had also requested that food be brought to his cell for his wife, who was not there, and asked that imaginary people be let out of his cell. R. 245. On occasions, the appellant spoke into his cell intercom in annoying and meaningless language so that the intercom in the dispatchers office had to be turned off. R. 245. Galloway had secretly observed the appellant several times "standing up at a wall [of his cell] . . . and he appeared to be talking to somebody." R. 254-55, 259. Galloway also verified that the appellant had cut another inmate with a razor blade, R. 1468, in July 1991, apparently without provocation. R. 247. Galloway did not "feel like [the appellant was] in as good shape now as he was when we put him in our jail . . . he acted more normal [before going to Taylor Hardin] than he has acted in the last few weeks." R. 246.
Wayne Baker, a jailer, worked the 3:00 p.m.-to-11:00 p.m. shift at the jail and saw the appellant every night for the ten months he was incarcerated. R. 261-63. He administered prescription medication, including Thorazine, Transeme, Artane, and Dalmane, to the appellant every night. R. 263-64. Baker testified that the appellant's mental condition had "definitely" changed since he had been incarcerated. "[W]hen he first got there, he was a more outgoing person. He talked to you a lot more. I guess just the time being in he's become a loner, just staying by himself." R. 268-69.
Baker said that the appellant was able to carry on a "normal" conversation about fifty percent of the time when he first came to the jail. R. 269. These "normal" conversations related to their families, how they were getting along, and current events. R. 277. In the past few weeks, the appellant had talked to Baker about wanting to see his wife and children. R. 278. Baker knew that several inmates had helped the appellant write letters to clergymen and family members. R. 277, 279. However, in the "past few weeks," the appellant had not "been able to carry on a normal conversation." R. 270. "[H]is conversations have become less normal as it has gotten closer to [the] time to come to court." R. 275. In the month preceding the competency hearing, the appellant had drawn attention to himself by "screaming, hollering, kicking, and carrying on." R. 270-71. On these occasions, the appellant had "been in his room with all his clothes off and just acting real bizarre," claiming *Page 149 
that "he was seeing warlords." R. 270, 282. These outbursts occurred when "there [were] lots of other people around to see." R. 276. Baker said that the appellant did not act like that when he was first admitted to the jail. However, Baker testified that the appellant had no problem getting along with the general jail population or following Baker's orders. R. 272-73.
John Mitchell, another jailer, testified that he regularly gave the appellant his medicine and he checked the appellant's mouth to make sure that he had swallowed the medicine. R. 287-88. Mitchell stated that after the appellant returned from Taylor Hardin, he "noticed a very serious change in [the appellant's] ways. . . . [The appellant] was hallucinating, saying that things were coming out of the wall to get him. . . . two or three times a week. . . . [This event] happened around noon time today [the day of the hearing]." R. 289. Mitchell had a two-or-three minute conversation with the appellant the morning of the hearing. He characterized that conversation as "normal." R. 290, 294-95, 297. However, he would not classify their noontime conversation as "particularly normal." R. 290, 295. Again, the appellant "brought up the subject . . . that . . . he could hear voices. . . . [coming out of] the jail itself." R. 290. Mitchell reported that in the last few months the appellant "would be hallucinating and he would completely strip himself" but that he always cooperated when instructed to put his clothes back on. R. 290-91. Approximately two weeks before the competency hearing, the appellant told Mitchell "that there was something black coming out of the wall to get him. And he was completely stripped." R. 291. In Mitchell's opinion, the appellant's "unusual conduct" had increased since he had come back from Taylor Hardin. R. 292.
Dr. Kathleen Rogers is a clinical psychologist at Taylor Hardin Secure Medical Facility. R. 307-08. She completed a court-ordered evaluation of the appellant at Taylor Hardin on November 26, 1990. At that time, Dr. Rogers saw the appellant for approximately two hours, reviewed mental health records indicating that the appellant had been receiving treatment since 1988, and spoke with one of the Marshall County jailers. She concluded that the appellant
 "was experiencing symptoms of what we call a thought disorder, more particularly, schizophrenia, and that due to the symptoms that he was experiencing, he would not be able to participate in legal proceedings, understand what was going on during the legal proceedings." R. 310.
Dr. Rogers evaluated the appellant again on the day of the hearing at the trial judge's request. R. 302-03, 313. Based on a personal interview with the appellant, as well as on conversations with several members of the jail staff and professionals at the local mental health center who had observed the appellant for some time, Rogers concluded that the appellant was not competent to stand trial. She gave the following opinion:
 "[H]e at this point in time is again showing symptoms associated with the thought disorder, schizophrenia. Some of the symptoms that are evident . . . include hallucinations . . . delusions . . . [and] effective lability. . . . [H]e periodically will become confused, does not know what's going on around him. He also appears to be responding to what we call internal stimuli. He's also expressing suicidal ideation today.
 "When I saw him in November, he was more psychotic than he is now. I think he's a little bit better at this point in time than he was back in November of last year. But he's still clearly showing signs of a mental illness. . . .
 "I would recommend . . . hospitalization at this point in time. . . . [I]t's my opinion that he needs a higher level of [psychiatric monitoring] in order . . . for the symptoms . . . to decrease enough that he would be capable of participating in legal proceedings." R. 313-16.
On cross-examination, Dr. Rogers stated that the appellant had reported to her that in the past he had taken the following controlled substances: marihuana, cocaine, LSD, Valium, Dilaudid, PCP, peyote, uppers, and downers, he said "everything but *Page 150 
crack." R. 338-39. She agreed that some of those substances were "capable of producing hallucinations" or "flashbacks." R. 339. She testified that in making her diagnosis of schizophrenia she took "into consideration [the appellant's] use of these drugs in . . . heavy doses." R. 340.
On cross-examination, Dr. Rogers admitted that in forming her first opinion that the appellant was not competent to stand trial (in November 1990), she did not use the "Competency to Stand Trial Assessment Instrument," an objective test administered to aid in determining if a defendant is capable of participating in legal proceedings. R. 341, 344. She testified that she did not ask the appellant any of the questions included on that test, such as whether he understood the charges against him, or the possible punishment, and whether he understood the role of the trial judge, the prosecuting attorney, and defense counsel. Rogers stated that she "determined that [the appellant's] symptoms of mental illness would interfere with his ability to participate in legal proceedings," and "didn't need to ask those questions." R. 344.
On further cross-examination, Dr. Rogers conceded that the symptoms that led to her diagnosing appellant as having "schizophrenia, paranoid type" did not complete the criteria listed in the Diagnostic and Statistical Manual of Mental Disorders, Third Edition, Revised (DSM-III-R), and that her diagnosis "could have been" a mistake. R. 344-45. She acknowledged that "a person can have such a mental illness as schizophrenia but still be competent to stand trial." R. 343. However, after evaluating the appellant on the day of the competency hearing, Dr. Rogers maintained "that [the appellant's] mental illness interferes with his ability to understand the proceedings against him at this time." R. 346.
Dr. James Hooper, a psychiatrist and certified forensic examiner on the staff of Taylor Hardin Secure Medical Facility, first evaluated the appellant on March 21, 1991, R. 353, and concluded that the appellant was competent to stand trial. That conclusion was based, in part, on the appellant's answers to the Competency to Stand Trial Assessment Instrument, which Hooper administered.
Dr. Hooper examined the appellant again on the morning of the competency hearing at the trial judge's request. R. 303, 356. He spent an hour and a half or two hours with the appellant and concluded that the appellant was "[i]n general, . . . pretty bizarre today," R. 358, and "fairly psychotic." R. 367. Dr. Hooper said the appellant made a number of bizarre comments "similar to the kinds of things that we saw when he was in the hospital back at Taylor Hardin when he was very ill." R. 358. He explained that since the appellant's release from the hospital,
 "the overall course of his medicines has been some decreased. They have been adjusted up and down and back and forth, but overall they are slightly lower than they were when we released him from the hospital. And, consistently, all the people at the jail and the people at the Mental Health Center report that he has deteriorated over time. And I don't see any inconsistency in that. The medicine has gone down and he's gotten worse. And that's pretty much what I would expect." R. 360-61.
According to Dr. Hooper, the appellant was currently "on roughly three-fourths as much medicine but he's taking it roughly a third more often." R. 356.
When asked if he had an opinion about whether the appellant was competent to understand the charge against him, Dr. Hooper responded,
 "It's a somewhat difficult question because he was fairly disorganized in answering specifics about that. He has some comprehension but he also vacillated back and forth between thinking he was in jail because he hadn't paid some fines and thinking that he was going to go to the electric chair. So it's not perfectly clear to me that he has a good understanding of the charge." R. 361.
Hooper testified that during both of his evaluations, the appellant was able to relate the events surrounding the offense *Page 151 
with which he was charged. Responding to the question whether the appellant was "in a state of mind that he can reasonably be expected to aid in his defense," Dr. Hooper answered, "I have a very strong opinion about that. I do not think that he is in that point of mind." R. 361. "My opinion is basically that this man is quite ill and is not thinking logically and, therefore, cannot logically work with his attorney." R. 369.
When asked whether he administered the Competency to Stand Trial Assessment Instrument to the appellant on the day of the hearing, Dr. Hooper replied,
 "I did not go through every question on that exam because part of what we are doing is determining whether this person really has the ability to rationally cooperate with his attorney. And when you feel like this person has clearly got a lot of serious psychiatric symptoms, it's fairly obvious that he's not going to be able to clearly and rationally cooperate with his attorney." R. 367.
Dr. Hooper testified that he did ask the appellant how many people were on a jury, how jurors were selected, and what the roles of the attorneys were. In response to the second question the appellant said that "people came down and signed up for [jury service]." R. 368. On cross-examination, Dr. Hooper acknowledged that he himself did not know how jurors were chosen. In response to the third question, the appellant answered that "both attorneys were there to testify to the Judge, and that [the] attorney[s] would testify either for or against him and that he had no knowledge who would do what." R. 369. On cross-examination the following occurred:
 "Q. Did you ask [the appellant] if he knew what 'testified' meant?
 "A. I don't think I asked him that specific question.
 "Q. So you don't know if he meant when we go up to the bench and talk to the Judge, whether he was talking about that or not, do you?
 "A. He did make the statement that he thought his attorneys worked for the Judge because they talked to the judge." R. 369.
In answer to the question whether the appellant could have been malingering or faking his symptoms, Dr. Hooper responded:
 "If [the appellant] is faking what he is doing, then he deserves an Academy Award for his faking. He is giving very similar symptoms to what we saw in the past with him. His symptoms are very consistent with that of somebody who has a severe mental defect and illness. They are the symptoms that went away when we medicated him properly in the past. His medications have been reduced and the same symptoms have come back.
 "I find it very difficult to believe that [the appellant] could be sophisticated enough and intelligent enough to know all the right things to say to present a perfect picture of an illness. So my feeling is, yeah, I have a fairly high certainty that he is quite sick at this time. . . . I would say that I feel probably that 90 percent of what he is presenting right now, I'm confident is a result of his illness. The other 10 percent maybe is, maybe is not." R. 359-60.
The defendant bears the initial burden of showing that there are "reasonable ground[s] to doubt" his competence to stand trial. See Ala. Code 1975, § 15-16-21; Waldrop v. State,459 So.2d 953, 955 (Ala.Cr.App. 1983), affirmed, 459 So.2d 959
(Ala. 1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050,85 L.Ed.2d 323 (1985). See generally Rule 11, A.R.Crim.P.
Rule 11 does not address the question of who has the burden of proof once the defendant initially establishes that there are "reasonable grounds to doubt" his competence and the matter proceeds to a hearing. We have found no Alabama authority which clearly allocates the burden of proof at a competency hearing.[1] While Rule 11 *Page 152 
addresses the quantum of proof ("clear, unequivocal, and convincing evidence"), it does not state which party bears theburden of adducing that proof. See Rules 11.6(c)(1) and (2), A.R.Crim.P.
In the absence of any Alabama authority on the subject, we rely on the general rule that a defendant has the burden of production at a competency hearing. He must come forward with evidence that he is not competent to stand trial. "Since a criminal defendant is generally presumed to be fit to stand trial, in [a competency hearing], the burden of producing, or coming forth with, evidence of incompetency is normally upon the defendant." 22A C.J.S. Criminal Law § 554 at 161 (1989) (footnotes omitted). Once the defendant has met his burden of production by presenting evidence that he is incompetent to stand trial, the State must then prove that the defendant is competent. "The weight of authority suggests that the prosecution bears the burden of proof of competency once the issue has been raised by the parties, or by the judge on his own motion." Commonwealth v. Crowley, 393 Mass. 393,471 N.E.2d 353 (1984) (quoted in 1 W. LaFave A. Scott, SubstantiveCriminal Law § 4.4 at 474 n. 42 (1986)).[2]
We find that the general rules relating to the burden of proof at a competency hearing are analogous to the rules regarding the burden of proof on the issue of self-defense. The accused has the burden of injecting the issue of self-defense, but once he has come forward with such evidence, the prosecution bears the burden of disproving that the accused acted in self-defense. Ex parte Johnson, 433 So.2d 479
(Ala. 1983).
In the present case, all the parties assumed that the appellant had the burden of proving his incompetence to stand trial. The assistant district attorney remarked, without contradiction by defense counsel, that the appellant's attorneys "go first [in closing argument], Judge. They have the burden of proof." R. 378. The jury was instructed, without objection from either party, as follows:
 "[T]here is a presumption under the law of the State of Alabama that a defendant charged with a crime is competent to stand trial. . . . Now, that presumption can be overborne or can be done away with by testimony, if it has been proven to your reasonable satisfaction that that presumption is not correct. Now, the burden of proving that presumption is not correct is upon the Defendant, Mr. Lackey. The State of Alabama, as it has done in this case, has no obligation or duty to put on any evidence at all. The State, through cross-examination if it's proven to you, can disprove the truth of the matter that the Defendant is claiming. And if you are not satisfied from the evidence that the Defendant is incompetent, then your ruling, of course, would be that he is competent to stand trial. And as I have said, the burden of proving that to you by a preponderance of the evidence and to your reasonable satisfaction is upon the Defendant.
 "Now, that burden of proof — I'm sure many of you have through what you have read and what you've watched on t.v. and that kind of thing, are aware that the burden of proof in a criminal case is beyond all reasonable doubt. *Page 153 
 Now, I charge you that that is not the burden of proof in this case. That burden of proof is much stronger, much more difficult to reach than the burden that is necessary in this case. The burden upon the Defendant in this case is to prove to you to your reasonable satisfaction that the Defendant has carried that burden of proof, so it is not that high degree of proof that is necessary in finding someone guilty of a crime."
R. 414-16 (emphasis added).
This charge is erroneous in three ways. First, it instructed the jury that the appellant had the burden of proof when, in fact, he had only the burden of first going forward with the evidence. Second, it did not instruct the jury that if the appellant succeeded in producing evidence of his incompetence, then the burden shifted to the prosecution to prove the appellant's competence. Finally, it used the wrong standard of proof; the standard at a competency hearing is "clear, unequivocal, and convincing" evidence, not a preponderance of the evidence. See Rules 11.6(c)(1) and (2).
The appellant did not, however, object to the jury instructions. His sole objection was a "motion for judgment NOV" on the issue of the appellant's competency (which we construe as a Rule 20.3 motion for a judgment of acquittal after verdict). The appellant stated no grounds for that motion and the trial court denied it without giving a reason for the denial. In the absence of any stated basis for the motion, this Court finds that the motion can be interpreted two ways.
First, the motion could be considered a contention that the case should never have been submitted to the jury in the first place — that the appellant was due to prevail as a matter of law and fact because (a) he alone presented evidence, (b) that evidence tended to prove his incompetence, and (c) the State offered no rebuttal. We reject this contention on procedural grounds because the appellant never objected to the submission of the case to the factfinder.
Second, the motion could be considered a contention that the jury verdict was contrary to the weight of the evidence. This contention is in fact what the appellant argues on appeal. He claims that in order to have found him competent to stand trial, the jury must have ignored or arbitrarily rejected the testimony of the two expert witnesses who gave their opinions that the appellant was not competent to stand trial.
In Ellis v. State, 570 So.2d 744 (Ala.Cr.App. 1990), this Court set out the standards for determining whether a jury's rejection of expert testimony is arbitrary. We quote at length from Ellis:
 "In this case, the defendant presented the only experts, and those experts testified that the defendant was [incompetent]. However, it is clear that (1) the prosecution need not rebut testimony for the defense that the defendant [is incompetent] with its own expert testimony of [competency], and (2) a jury may reject the opinion of an expert, even though that opinion is uncontradicted.
 " 'There is no requirement that the government rebut expert testimony with its own expert. . . . The same result may instead be accomplished by presenting lay witnesses or other evidence, or by cross-examination designed to weaken the defense expert's credibility.' United States v. Kennedy, 578 F.2d 196, 198 (7th Cir.), cert. denied, 439 U.S. 1049, 99 S.Ct. 727, 58 L.Ed.2d 709 (1978). See also United States v. Esle, 743 F.2d 1465, 1474
(11th Cir. 1984) ('Where . . . the basis of the expert's opinion has been thoroughly impeached, the court, as fact finder, is thus plainly authorized to reject the opinion entirely').
". . . .
 " 'Expert testimony, even when uncontradicted, is not conclusive on the issue of [competency], . . . and the jury may find such testimony adequately rebutted by the observations of mere laymen.' [United States v.] Mota, 598 F.2d [995] at 999 [(5th Cir. 1979), cert. denied, 444 U.S. 1084, 100 S.Ct. 1042, 62 L.Ed.2d 770 (1980)]. See also Greider v. Duckworth, 701 F.2d 1228, 1234 (7th Cir. 1983) ('The jury could credit the testimony of *Page 154 
 lay witnesses over that of an expert witness'); United States v. Emery, 682 F.2d 493, 498 n. 3 (5th Cir.), cert. denied, 459 U.S. 1044, 103 S.Ct. 465, 74 L.Ed.2d 615 (1982) ('The jury can find expert testimony adequately rebutted by the observations of laymen').
". . . .
 "A factfinder is not bound by expert testimony 'even if all of the witnesses are presented by only one side.' United States v. Pitts, 428 F.2d 534, 536 (5th Cir.), cert. denied, 400 U.S. 910, 91 S.Ct. 154, 27 L.Ed.2d 149 (1970). Such evidence
 " 'may be rebutted by showing the incorrectness or inadequacy of the factual assumptions on which the opinion is based, "the reasoning by which he progresses from his material to his conclusion," . . . inconsistencies or contradictions in his testimony as to material matters, [and] material variations between the experts themselves. . . . In some cases, the cross examination of the expert may be such as to justify the trier of fact in not being convinced by him. One or more of these factors may, depending on the particular facts of each case, make a jury issue as to the credibility and weight to be given to the expert testimony.'
 Mims v. United States, 375 F.2d 135, 143-44 (5th Cir. 1967) (footnotes omitted).
 "Although 'a factfinder need not adhere to an expert opinion on incompetency if there is reason to discount it,' Strickland v. Francis, 738 F.2d 1542, 1552 (11th Cir. 1984), 'the jury cannot arbitrarily ignore the experts in favor of the observations of laymen,' id., and must have an 'objective reason,' to disregard the expert's opinion which is rebutted only by lay testimony. Wallace v. Kemp, 757 F.2d 1102, 1109 (11th Cir. 1985)."
Ellis v. State, 570 So.2d at 751-52. Here, the jury had objective reasons to discount the testimony of Dr. Rogers and Dr. Hooper.
The jury could have rejected Dr. Rogers's opinion that the appellant was incompetent to stand trial because that opinion appeared to be based wholly on her judgment that he was mentally ill. However,
 " '[a] distinction must be made between mental illness and mental incompetency to stand trial, and the fact that a defendant is mentally ill does not necessarily mean that he is legally incompetent to stand trial. Thus, not every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence of defendant's mental unfitness must indicate a present inability to assist counsel or understand the charges.' "
Cowan v. State, 579 So.2d 13, 15 (Ala.Cr.App. 1990) (quoting 22A C.J.S. Criminal Law § 550 (1989)). Despite the fact that Dr. Rogers acknowledged that a person could be mentally ill yet still competent to stand trial, the psychologist never administered the Competency to Stand Trial Assessment Instrument to the appellant. She seemed to be so certain of the appellant's incompetency that she "didn't need" to ask him specific questions designed to measure his competency. The jury was given a reason to discount Dr. Rogers's apparent certainty about the appellant's mental state when the psychologist conceded that her diagnosis of schizophrenia did not conform to the DSM-III-R criteria and that she "could have" made a mistake.
The jury also had objective reasons to disregard Dr. Hooper's conclusions about the appellant's competency to stand trial. There was evidence that the appellant's behavior became increasingly more bizarre as the trial date approached. Dr. Hooper explained that behavior solely in terms of a decrease in the appellant's medication after his release from Taylor Hardin. Yet two of the lay witnesses said the appellant was more "normal" before he was ever sent to Taylor Hardin, thus implying that the appellant's behavior was not dependent on the level of medication prescribed at Taylor Hardin. Furthermore, the jury could have concluded that 25% less medication administered 33 1/3% more often was not a significant "decrease." The jury could have determined that, in view of the testimony *Page 155 
from the jailers that the appellant usually exhibited strange behavior only when he had an "audience," and that he could, at times, interact normally with others, Dr. Hooper's assessment that the level of medication alone accounted for the appellant's increasingly bizarre conduct was open to doubt.
The jury had another reason to believe that the appellant had been "faking" his symptoms and to reject Dr. Hooper's opinion to the contrary. The jury could have found that the appellant's familiarity with mind-altering drugs enabled him to remember and to feign certain hallucinatory effects that mimicked the symptoms of a serious mental disorder.
Dr. Hooper gave no clear opinion that the appellant was unable to understand the charges against him. He stated that the appellant "vacillated back and forth between thinking he was in jail because he hadn't paid some fines and thinking that he was going to go to the electric chair." The jury could have determined that the appellant's remark about unpaid fines was insignificant in light of the fact that he obviously knew, from his comment about the electric chair, that he was facing capital murder charges.
Although Dr. Hooper asked the appellant some of the questions on the Competency to Stand Trial Assessment Instrument at the time of his final evaluation of the appellant, Dr. Hooper did not administer the test, as such, to the appellant on the day of the hearing. Thus, the jury could have believed that Dr. Hooper, like Dr. Rogers, made a decision about the appellant's ability to stand trial without a thorough evaluation. From the questions Dr. Hooper did ask the appellant, the jury could have found that the appellant's responses indicated no more misunderstanding about trial procedures than that shared by other competent but nonlegally trained persons.
While Dr. Hooper was more positive about the appellant's inability to cooperate at trial with his attorney, the jury also had a reason to reject that conclusion. Hooper said that the appellant could relate the facts surrounding the alleged offense. Both jailers testified that the appellant had no trouble following instructions or getting along with the general jail population.
We hold that the jury had objective reasons to discount the opinions of the two experts who testified at the competency hearing. The opinions of those experts were called into question by cross-examination designed to weaken their credibility and by the testimony of the three lay witnesses who testified. A jury issue was presented as to the credibility and weight to be given to the expert testimony. See Ellis v. State, supra. The verdict did not constitute an arbitrary rejection of the opinions offered by the appellant's expert witnesses.
We note that a trial judge has an independent, "ongoing, and continuing duty to prevent the trial of an accused who is unable to assist in his defense." Gothard v. State,452 So.2d 889, 893 (Ala.Cr.App.), cert. stricken, 450 So.2d 479
(Ala. 1984). The trial court was not alerted during the remainder of the trial to the appellant's lack of understanding or inability to assist his attorney. There is nothing in the trial transcript to indicate that the appellant did not consult with his lawyer and assist in his defense at trial. The appellant's own testimony at the sentence hearing indicates that he was lucid and able to aid in that defense.
 II
The appellant was charged with two counts of capital murder. Count One charged that he committed murder during a robbery, the indictment alleging that he committed a forceful theft of the victim's jewelry. Count Two charged that he committed murder during a burglary, the indictment alleging that he entered or remained unlawfully in the victim's residence with the intent to commit theft. The jury acquitted him of the crime charged in Count One and convicted him of the crime charged in Count Two.
The appellant argues that the verdicts are inconsistent because, by acquitting him on Count One, the jury must have found that he did not commit a theft of the victim's *Page 156 
jewelry, whereas by convicting him on Count Two, the jury must have found that he intended a theft, yet the same evidence used to show his intent to commit a theft also showed an actual completed theft.
At trial, the prosecution introduced a statement by the appellant in which he admitted that he entered the victim's home on the pretext of using the telephone, R. 1231-33, took the victim's rings from her fingers, removed a small device called a "Lifeline activator" from a chain around her neck, and stabbed the victim. He threw the Lifeline activator into the trash can and he flushed the rings down the toilet. R. 1229, 1235-36. These facts tend to prove both murder during a robberyand murder during a burglary.
However, "[t]he general rule is that consistency between the verdicts on the separate counts of a multicount indictment is not required." Moss v. State, 536 So.2d 129, 136
(Ala.Cr.App. 1988).
 "A defendant convicted by a jury on one count cannot attack that conviction on the ground that it is inconsistent with the jury's verdict of acquittal on another count. Dunn v. United States, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932).
 " 'The general rule is that there need be no rational compatibility or consistency between the verdicts on the several counts of an indictment. The exception to this rule is where the jury returns multiple convictions as to crimes which are mutually exclusive of each other. Conway v. State, 489 So.2d 641, 642
(Ala.Cr.App. 1986) (Verdicts of not guilty by kidnapping and guilty of felony-murder were mutually exclusive. Verdicts of not guilty of intentional murder but guilty of manslaughter and guilty of felony-murder were not mutually exclusive.). See also Smelcher v. State, 520 So.2d 229, 232 (Ala.Cr.App. 1987) (verdicts of guilty of rape but not guilty of sodomy [when victim testified that defendant raped and
sodomized her] not inconsistent); Oden v. State, 41 Ala. App. 212, 215, 127 So.2d 380 (1961) ("On review we cannot treat the two counts as charging an indivisible crime or even yoked offenses." No error found because a conviction for making or distilling alcoholic liquors and acquittal for possession of a still).' "
 Grikis v. State, 552 So.2d 187 (Ala.Cr.App. 1989) (brackets added)."
Inmon v. State, 585 So.2d 261, 268 (Ala.Cr.App. 1991).
The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.
[1] In Thompson v. State, 364 So.2d 681 (Ala.Cr.App. 1976), cert. quashed, 364 So.2d 682 (Ala. 1977), the Court of Criminal Appeals observed that the testimony of the accused's expert that the accused was suffering from amnesia "virtually shifted the burden to the prosecution" to show that the accused was competent to stand trial. In quashing the writ, the Alabama Supreme Court disapproved of the language relating to the legal effect of amnesia on the accused's competency to stand trial without clarifying the burden of proof in competency proceedings.
[2] In footnote 41 of this same passage, LaFave and Scott cite Ala. Code 1975, § 15-16-2, for the proposition that some states require the defendant to shoulder the burden of proving his incompetence to stand trial. Section 15-16-2, however, applies only to the burden of proving the affirmative defense ofinsanity at trial:
 "Every person over 14 years of age charged with crime is presumed to be responsible for his acts, and the burden of proving that he is irresponsible is cast upon the accused. The defense of insanity in all criminal prosecutions shall be clearly proved to the reasonable satisfaction of the jury."
The statute is not authority for the proposition that the defendant has the burden of proof at a separate competency hearing.