BOWEN, Presiding Judge.
This is an appeal from the order of the Juvenile Court of Jefferson County directing the transfer of a 16-year-old, A.W.M.,[1] to circuit court for prosecution as an adult for his participation in “aiding and abetting” in the capital murder/robbery of William R. Wesson at Bill’s Farmhouse Restaurant in Hueytown, Alabama.
I.
A.W.M. argues that his three custodial statements to the police were involuntary because there was no compliance with Rule 11(A)(4), A.R.Juv.P., which provides:
“When [a] child is taken into custody, he must be informed of the following rights by the person taking him into custody:
“(4) if his counsel, parent, or guardian is not present, that he has a right to communicate with them, and that, if necessary, reasonable means will be provided for him to do so.”
There was conflicting evidence on whether the requirements of Rule 11(A) were satisfied. The appellant testified in his own behalf at the hearing on the motion to suppress. His testimony directly conflicted with the testimony of the police officers to the extent that either the officers perjured themselves or the appellant did.
“‘[Wjhere, on the issue of the voluntariness of a confession, evidence offered by the defendant conflicts with that offered by the State, it creates a question of fact for the trial judge.’ ” O.M. v. State, 595 So.2d 514, 523 (Ala.Cr.App.1991), cert. quashed, 595 So.2d 528 (Ala.1992).
“In determining whether a confession is voluntary, the trial court’s finding of volun-tariness need only be supported by a preponderance of the evidence.... The trial court’s decision will not be disturbed on appeal unless it is manifestly contrary to the great weight of the evidence....
“We note that the trial judge, as the finder of fact, determined the credibility of the witnesses. The trial court’s determination regarding credibility of witnesses is entitled to great weight on appeal....
“... ‘ ‘Where the evidence of voluntariness is conflicting, and even where there is credible testimony to the contrary, the trial judge’s finding of voluntariness must be *1150 upheld unless palpably contrary to the weight of the evidence.” ’ Carr v. State, 545 So.2d 820, 824 (Ala.Crim.App.1989) (other citations omitted).”
Dixon v. State, 588 So.2d 908, 907-08 (Ala.1991), cert. denied, — U.S.-, 112 S.Ct. 904, 116 L.Ed.2d 805 (1992). “When there is conflicting evidence of the circumstances surrounding an incriminating statement or a confession, it is the duty of the trial judge to determine its admissibility, and if the trial judge decides it is admissible his decision will not be disturbed on appeal ‘unless found to be manifestly contrary to the great weight of the evidence.’” Ex parte Matthews, 601 So.2d 52, 53 (Ala.), cert. denied, — U.S. -, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992).
The officers testified that A.W.M. voluntarily waived his right to talk to a lawyer or his parents before any questioning. There is evidence that he was advised of his “juvenile Miranda rights” before each of the three times he was questioned. Specifically, in connection with Rule 11(A)(4), A.W.M. was advised: “You have the right to talk to your lawyer, parent or guardian before questioning, if you wish.” CR. 6, 9, 21. On the one “juvenile rights waiver” form signed by A.W.M., there appears the statement: “Having these rights in mind, I wish to make a voluntary statement and answer any questions without contacting a lawyer, my parents), my guardian(s), or having one present.” CR. 21.
A.W.M. contends that he was never fully informed of his rights because he was never advised that “if necessary, reasonable means [would] be provided” for him to talk to his parents. There is no contention made that A.W.M. desired the presence of his parents but did not have a means to either contact them or have them brought to him.
We apply the same principles to Rule 11 as we do to the Miranda[2] lights. Ex parte Whisenant, 466 So.2d 1006, 1007 (Ala.1985).
‘We have never insisted that Miranda warnings be given in the exact form described in that decision. In Miranda itself, the Court said that ‘[t]he warnings required and the waiver necessary in accordance with our opinion today are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant.’ 384 U.S., at 476 [86 S.Ct. at 1629] (emphasis added)_ In California v. Prysock, 453 U.S. 355, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981), we stated that ‘the “rigidity” of Miranda [does not] exten[d] to the precise formulation of the warnings given a criminal defendant,’ and that ‘no talismanic incantation [is] required to satisfy its strictures.’ Id. [453], at 359, 101 S.Ct., at 2809.”
Duckworth v. Eagan, 492 U.S. 195, 202-03, 109 S.Ct. 2875, 2879, 106 L.Ed.2d 166 (1989) (footnote omitted). “[T]here is no one singularly correct form of Miranda.” United States v. Harrell, 894 F.2d 120, 125 (5th Cir.), cert. denied, 498 U.S. 834, 111 S.Ct. 101, 112 L.Ed.2d 72 (1990). While we do not endorse this abbreviated version of Rule 11(A)(4) used in this case, “we do not believe that it diluted the substance of the warning” under the circumstances of this case. United States v. Cruz, 910 F.2d 1072, 1079 (3d Cir.1990), cert. denied, 498 U.S. 1039, 111 S.Ct. 709, 112 L.Ed.2d 698 (1991). Here, the rights of which A.W.M. was informed sufficiently conveyed the rights to which he was entitled under Rule 11(A)(4).
II.
The appellant claims that the juvenile court should have required the disclosure of the identity of the “confidential informant” from whom the police initially obtained information that the appellant was involved in the charged offense. The appellant claims that he is entitled to discover the identity of the informant in order to prepare his defense and because there was no probable cause for his arrest.
The evidence shows that after the police had obtained information from a citizen, two officers met with the citizen who showed them were some of the juveniles lived. The next day, the police went to the high school the appellant was attending, told someone in authority that they needed to talk to the appellant, and questioned the appellant in the *1151 principal’s office at the school, after obtaining a waiver from the appellant of his constitutional rights. The testimony indicates that the citizen’s tip provided the police with reasonable suspicion to question the appellant. R. 253, 254, 282. The police obtained the probable cause to arrest the appellant based on the appellant’s own statement. R. 264.
Specifically, Fairfield Police Detective Reuben Wilkerson testified that on the night or afternoon of June 22, 1992, he “received a phone call from a person that told me they knew about the Bill’s Farmhouse robbery.” R. 355-56. Wilkerson met with that person later that same date and then telephoned the Hueytown Police Department. He then met with Hueytown Police Sergeant Jim Rice and the person who had telephoned him earlier. Sergeant Rice and Hueytown Police Officer Joe Johnson went to the school the next day and interviewed the appellant in a school office (either the principal’s office or an ad-visor’s office, R. 584). Officer Johnson testified that he advised the appellant “of his rights and asked him if he wanted to call his parents.” R. 584. The appellant waived his rights and indicated that he did not want to telephone his parents. He “first denied it and very shortly he admitted his involvement.” R. 589.
The prosecutor represented to the juvenile court that “[bjasically what we have here is a citizen’s tip.... We’re not talking about any information received from a CL” R. 252-53, and that the citizen-informer was not present at the scene of the crime. R. 246. The juvenile judge examined Sgt. Rice in camera concerning the informant. However, he permitted no record of that examination. R. 257-59.
It is reasonably clear to this Court that there was a sufficient restraint of the appellant by a “show of authority” so that a seizure of the appellant had occurred when he entered the office in the school where the questioning took place. Terry v. Ohio, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968). An informant’s tip may justify a Terry stop, Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), when the informant is known and reliable, see Ex parte Carpenter, 592 So.2d 627 (Ala.1991), or even when the informant is anonymous, provided that the anonymous tip is corroborated by independent police work, Alabama v. White, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990).
“[I]f police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a Terry stop may be made to investigate that suspicion.” United States v. Hensley, 469 U.S. 221, 229, 105 S.Ct. 675, 680, 83 L.Ed.2d 604 (1985). Under Terry, “investigative seizures are permissible when based on a reasonable, articulable suspicion that a person has committed a crime. While under detention, a suspect may be asked (but need not answer) questions to determine his identity and to obtain information about the officer’s suspicion.” United States v. Arcobasso, 882 F.2d 1304, 1306 (8th Cir.1989).
Reasonable suspicion sufficient to justify a Terry stop is
“a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.... Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors — quantity and quality — are considered in the ‘totality of the circumstances — the whole picture,’ United States v. Cortez, 449 U.S. 411, 417 [101 S.Ct. 690, 695, 66 L.Ed.2d 621] (1981), that must be taken into account when evaluating whether there is reasonable suspicion. Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable.”
Alabama v. White, 496 U.S. at 330, 110 S.Ct. at 2416 (emphasis added).
Because the juvenile court judge examined Sgt. Rice in camera and permitted no record *1152 of that examination, this Court cannot determine whether the reasonable suspicion standard was met. We know neither the content nor the degree of reliability of the information possessed by the police prior to the appellant’s detention and questioning.
We therefore remand the probable cause phase of the juvenile court’s order with directions that the juvenile judge reconstruct his in camera examination of Sgt. Rice and provide this court with a record or summary of that examination on return to remand. The juvenile court shall take the necessary action to see that the clerk makes due return to this court at the earliest possible time and within 60 days of the release of this opinion.
III.
A.W.M. contends that the juvenile court abused its discretion in ordering his transfer by placing an inordinate amount of significance upon the nature of the alleged offense and by underemphasizing the other factors which should have been considered.
This Court reviews the dispositional phase of a juvenile court’s transfer order under the “clear and convincing evidence” standard rather than the “abuse of discretion” standard. O.M. v. State, 595 So.2d 514, 526 (Ala.Cr.App.1991), cert. quashed, 595 So.2d 528 (Ala.1992). “ ‘[A]n appellate court must find, within the record, clear and convincing evidence in order to affirm a juvenile court’s determination at the disposition hearing that it is in the best interest of the child or the public to transfer the child for criminal prosecution.’” D.D.P. v. State, 595 So.2d 528, 536 (Ala.Cr.App.1991) (quoting Ex parte J.R., 582 So.2d 444, 449 (Ala.) (Kennedy, J., dissenting from the quashing of a writ of certiorari), cert. denied, — U.S.-, 112 S.Ct. 122, 116 L.Ed.2d 90 (1991)).
The decision to transfer a juvenile for prosecution as an adult may not be based solely on the nature of the offense.
“[I]t is improper for a juvenile court to transfer a juvenile to the circuit court based solely on the nature of the offense itself The juvenile court should look to the facts underlying the offense in order to determine whether a transfer is warranted. The seriousness of the offense alone does not establish that a juvenile is not susceptible to rehabilitation in the juvenile court system.”
Ex parte J.D.G., 604 So.2d 378, 384 (Ala.1992) (Kennedy, J., dissenting from the quashing of a writ of certiorari) (emphasis in original). See also Ex parte Farrell, 591 So.2d 444, 449 (Ala.1991) (“a criminal charge in and of itself cannot be used as the sole basis for properly denying a petition for youthful offender status”) (emphasis deleted). Instead, the juvenile court should examine the facts underlying the alleged offense and the circumstances surrounding the juvenile’s participation in that offense, along with the other five factors of Ala.Code 1975, § 12-15-34(d). N.D.T. v. State, 592 So.2d 647, 650 (Ala.Cr.App.1991); J.S.A. v. State, 615 So.2d 1288 (Ala.Cr.App.1993).
The order of transfer reflects that the juvenile court considered each of the six factors of (Ala.Code 1975, § 12-15-34(d).
“Evidence of the following and other relevant factors shall be considered in determining whether the motion [to transfer] shall be granted:
“(1) The nature of the present alleged offense;
“(2) The extent and nature of the child’s prior delinquency record;
“(3) The nature of past treatment efforts and the nature of the child’s response to such efforts;
“(4) Demeanor;
“(5) The extent and nature of the child’s physical and mental maturity;
“(6) The interests of the community and of the child requiring that the child be placed under legal restraint or discipline.”
The State presented evidence that Mr. Wesson was killed on the evening of May 15, 1992, at the Farm House Restaurant by a single gunshot wound to the back during the commission of a robbery. The robbery was committed by A.W.M. and four other juveniles [3].
*1153 In his first statement of June 23, 1992, A.W.M. stated that four of his high school classmates arrived at his residence in an automobile and “asked [him] to ride with them” CR. 9; that he knew about the planned robbery “[f]rom the time that they picked me up from my house” CR. 17; and that N.W. and D.H. went inside the restaurant and that he, R.J., and J.W. remained in the automobile. There was other testimony that the appellant was “riding around” with the four other juveniles for approximately three and one-half hours before the robbery. There was evidence that Mr. Wesson was shot while lying face down on the floor. In addition, there was some testimony that J.L.W. had been employed at the Farmhouse Restaurant and had had a dispute with the owner earlier in the day. There was other evidence that three of the juveniles went inside the restaurant while two remained in the automobile.
In his second statement of that same date, A.W.M. admitted that he went inside the restaurant with N.W. and D.H., that he was armed with a .25 caliber firearm, that D.H. carried a shotgun, that they were wearing stocking masks, that he and D.H. “ran around to the cash register and asked for the money.... [W]e grabbed the money and left.” CR. 6. In neither statement was A.W.M. asked who shot Mr. Wesson. In a statement to the police, N.W. admitted shooting Mr. Wesson, although he later claimed it was accidental. R. 375. There was testimony that the appellant and D.H. obtained the automobile used in the robbery by “renting” a car from a high school classmate for $50.
The “probation services report in compliance with section 5-129(e) Alabama Juvenile Code” addresses the six factors of § 12-15-34.

“THE NATURE OF THE ALLEGED OFFENSE [§ 12-15-3Jp(d)(l) ]:

“It is alleged that on or about May 15, 1992, said A.W.M. did aid and abet N.W., who in the course of committing a robbery, did cause the death of William Wesson by shooting him with a pistol.”

“THE EXTENT AND NATURE OF THE CHILD’S PRIOR DELINQUENCY RECORD [§ 12-15-34 (D) (2) ]:

“Said youth has no prior record.”
“THE NATURE OF PAST TREATMENT EFFORTS AND THE NATURE OF THE CHILD’S RESPONSE TO SUCH EFFORTS [§ 12-15-34.(d)(S) ]: “There have been no past treatment efforts.”

“DEMEANOR [§ 12-15-3h(d)(h) ]:

“A.W.M. was mannerable and cooperative during interview; which, although not uncommon behavior for a detained youth, seemed genuine. There have been no negative reports regarding him while detained. A.W.M. attended Ensley High School and was enrolled in summer school up to the time of being detained. A.W.M.’s grades are fair to good — with low scores in Geometry and Science and high scores in Concert Band, ROTC and History. It appears that youth is capable of better grades. He had over 20 absences— 9 excused. He was suspended twice — once for fighting. A.W.M. was employed two summers with Burger King in California. He received very positive reports from his supervisor regarding his work ethic, reliability, and personality. AW.M.’s parents and stepparents seems to be very active and supportive in his life. He tested negative for drugs. A.W.M. denied gang involvement but reported interest in pledging a high school frat.”

“THE EXTENT AND NATURE OF THE CHILD’S PHYSICAL AND MENTAL MATURITY [§ 12-15-3A(d)(5) ]:

“A.W.M. is a 15-year-old black male. He is approximately 5'9" tall and weighs approximately 150 pounds. He appears to be both physically and mentally mature for his age (See attached psychological evaluation).”

“THE INTEREST OF THE COMMUNITY AND OF THE CHILD REQUIRING THAT THE CHILD BE PLACED UNDER LEGAL RESTRAINT OR DISCIPLINE [§ 12-15-31 (d)(6) ]:

*1154 “It is feasible that youth may respond positively toward treatment in the juvenile system. It is also indicated that he has the parental support to enhance a positive respond [sic]. However, due to the nature of said offense and in the interest of the community, it is the recommendation of probation services that said youth be transferred to stand trial as an adult.” CR. 40-41.
Under the “recommendations” portion of the psychological evaluation report appears the following:
“Technically speaking, A.W.M. is able to stand trial as an adult. He fully understands the charge against him, can discuss •it logically, and can aid in his defense. He is not psychotic nor is he mentally retarded.
“A.W.M. presents with many strengths that need to be considered in this MIT hearing. He is bright and articulate. His MMPI is normal. He has no legal history. He is upset and even anguished over his behavior. He is in school, not involved in drugs, and has no psychiatric history. He comes across as quiet, soft-spoken, and reasonable. A.W.M. does not appear to be defiant, hostile, or insensitive.
“I think A.W.M. is an excellent candidate for treatment and rehabilitation. I say this because of his apparent strengths and resources.” CR. 26.
Larry Hooks, the probation officer with the Jefferson County Family Court, prepared the probation services report on the appellant. He testified that his recommendation in this case was “very hard” to make, that it was a strong possibility that the appellant would do well in the juvenile justice system, that he felt the appellant was “a good candidate” for treatment and rehabilitation. R. 1072,1080,1081. When asked if his recommendation that the appellant be transferred was “a strong or a weak recommendation,” Officer Hooks testified, “That’s a recommendation after a lot of thought. I can’t say that it’s strong.” R. 1083. His transfer recommendation was based on the nature of the offense and the interest of the community-
Despite the fact that this is a close case and that the decision of the juvenile court is not necessarily one this Court would have reached, we cannot say that the juvenile court’s transfer order was based solely on the nature of the offense or was unsupported by clear and convincing evidence. In our opinion, the decision of the juvenile court was based on the facts underlying the offense and the circumstances surrounding A.W.M.’s participation in the offense, in conjunction with the other relevant statutory factors.
The appellant was physically and mentally mature for his age. He took an active role in the commission of a robbery during which he was armed with a small caliber handgun. There is evidence that he was a major participant in the planning of the robbery, arranging to “rent” the automobile used in the offense from a classmate for $50, and discussing how the robbery would be committed during the three and one-half hours he and his co-defendants spent together immediately before the crime was committed. There is every indication present that the appellant knew exactly what he was doing. There is no evidence that he was under the influence of alcohol or drugs. There is also evidence that the victim was not only intentionally killed but was in fact executed.
These circumstances are a far cry from the facts of Ex parte J.D.G., supra, in which an intoxicated 14-year-old with “poor impulse control” shot and killed an “aggressive” 18-year-old during a “rumble.” 604 So.2d at 380. Yet this Court affirmed the transfer order in J.D.G. v. State, and the Alabama Supreme Court declined to review the cause, notwithstanding the fact that J.D.G. had a “high-average level of intelligence,” no prior juvenile record, and was a model student at school. 604 So.2d at 380.
The appellant’s psychological evaluation indicated that he was “quiet, soft-spoken, and reasonable” rather than “defiant, hostile, or insensitive,” and that he had no “delinquent] or anti-social tendencies.” The juvenile judge was authorized to discount that report — and its conclusion that “[A.W.M.] is an excellent candidate for treatment and rehabilitation” — in light of evidence that the appellant deliberately planned and willingly *1155 participated in the hostile and anti-social act of armed robbery. Compare Lackey v. State, 615 So.2d 145 (Ala.Cr.App.1992) (when the factfinder has an objective reason to doubt the validity of an expert’s conclusion, it may give the expert’s testimony little or no weight).
The juvenile court heard evidence that the appellant had been involved in church activities and that his parents were “active and supportive.” While this evidence could indicate that the appellant should remain in the juvenile system, it could also tend to support the opposite conclusion. The court may have found that the appellant’s background was already more stable and secure than that of most other juvenile offenders who appeared before him. He could have concluded that the appellant would not derive the benefit from juvenile rehabilitative services from which other youths, with less stable and supportive backgrounds, were expected to profit.
In addition, the court was authorized to find that, regardless of the services provided in the juvenile system, the appellant would have been in the custody of the Department of Youth Services only until he was twenty-one years old, a maximum of five years, and that the “interests of the community ... require® that the [appellant] be placed under legal restraint or discipline” for a longer period. Ala.Code 1975, § 12-15-84(d)(6). Compare N.D.T. v. State, 592 So.2d 647 (Ala.Cr.App.1991).
‘“The decision to transfer a juvenile for prosecution as an adult is a judicial one, ... involving a mandatory consideration of each of the factors enumerated in Section 12-15-34(d)_ While “legislation compels consideration of each of the six factors,” Reeves [v. State, 419 So.2d 217, 218 (Ala.1982) ], the weight to be given each of those factors in balancing the interests of the juvenile and society must be left to the sound discretion of the juvenile court judge. Even though some of the factors may indicate that it would be in the best interest of the child and the public to treat the youth as a juvenile, the judge may still order treatment as an adult after weighing all the factors and circumstances involved.’
“... The trial judge can assign appropriate weight to the six factors listed in § 12-15-34(d) as well as other relevant circumstances. The statute does not require that specific weights be assigned to different factors and circumstances. Consequently, the trial judge is free to consider each case individually and balance the particular circumstances involved.”
Williams v. State, 494 So.2d 887, 890 (Ala.Cr.App.1986) (emphasis in original). See also J.S.A. v. State, 615 So.2d 1288 (Ala.Cr.App.1993); T.J. v. State, 611 So.2d 1116, 1118 (Ala.Cr.App.), cert. denied, 611 So.2d 1118 (Ala.1992); A.M. v. State, 621 So.2d 369 (Ala.Cr.App.1992).
After a careful review of the testimony elicited in this case, we conclude that in making its decision to transfer the appellant, the juvenile court did not consider solely the nature of the offense; instead, the court evaluated the underlying circumstances of the offense and weighed the appellant’s participation therein in conjunction with the required statutory factors. We hold that the dispositional phase of this cause was supported by clear and convincing evidence.
The probable cause phase is remanded with directions.
REMANDED WITH DIRECTIONS.
All Judges concur.

. Rule 52, A.R.App.P., provides in pertinent part that "[i]n any case involving a juvenile who has been the subject of a proceeding in the juvenile court system, ... the appellate court shall make reasonable efforts to preserve the anonymity of such a person."

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. One juvenile's transfer was affirmed by this Court in D.R.H. v. State, 615 So.2d 1327 (Ala.Cr. *1153 App.1993). The appeals of the transfer orders of the three remaining juveniles are pending in this Court. See R.J. v. State, CR 92-140; N.W. v. State, CR 92-99; J.L.W. v. State, CR 92-89.